[No. 46708-5-I.   Division One.   April 1, 2002.]

MONTLAKE COMMUNITY CLUB, *Appellant*, v. CENTRAL PUGET
SOUND GROWTH MANAGEMENT HEARINGS BOARD, ET AL.,
*Respondents*.

*Roger M. Leed* (of *Roger M. Leed, P.S.*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Sharon S. Eckholm, Assistant,* for respondent Central Puget Sound Growth Management Hearings Board.

*Thomas A. Carr, City Attorney,* and *Robert D. Tobin, Assistant,* for respondent City of Seattle.

BECKER, C.J. — To satisfy the transportation and concurrency requirements of the Growth Management Act, the City of Seattle employs a screenline methodology that was incorporated into the comprehensive plan the city adopted in 1994. A subarea plan adopted in 1998 for the University community incorporates the same methodology. Montlake Community Club's (Club) petition for review of the 1998 subarea ordinance seeks to have level of service standards established for individual arterial segments within the subarea, such as the Montlake Bridge. Because the subarea plan does not amend the screenline methodology or change the level of service standards set by the 1994 citywide plan, we conclude the Central Puget Sound Growth Management Hearings Board (Board) properly rejected the Club's petition as untimely.

Montlake Community Club is a nonprofit organization serving a residential neighborhood located directly south of the University of Washington, across Portage Bay and the Montlake Cut. The Club is concerned, among other things, about gridlock on and around the Montlake Bridge. The bridge is a state-owned facility that connects the Montlake

community with the University District. Montlake Boulevard East, a congested corridor that crosses the bridge, is a state highway and a principal city arterial connecting to State Route 520, a major freeway.

The City of Seattle adopted a new, citywide comprehensive plan in 1994 that was designed to comply with the Growth Management Act. The plan designated the University Community Urban Center as one of five "urban village" areas planned for high density.

The City then initiated a subarea planning process for the University Community Urban Center. Although the Montlake neighborhood lies outside the boundary of the Urban Center, the Club participated in the process and asked the city to study traffic impacts on Montlake Boulevard and Pacific Avenue at eight specific intersections. The City adopted the subarea plan in 1998 as an amendment to the 1994 Seattle Comprehensive Plan through Ordinance No. 119230. Concerned that the City had inadequately studied the impact that growth planned for the subarea would have upon these street segments that are already congested, the Club appealed the ordinance to the Central Puget Sound Growth Management Hearings Board within 60 days of its adoption. The Club sought an order from the Board invalidating or remanding the ordinance. The Board dismissed the Club's appeal as untimely, and did not address the merits of the appeal. The superior court affirmed. The Club now appeals to this court.

■ In reviewing an administrative action, the appellate court sits in the same position as the superior court, applying the standards found in the Administrative Procedure Act directly to the record before the agency. *N.W. Steelhead & Salmon Council of Trout Unlimited v. Dep't of Fisheries*, 78 Wn. App. 778, 785, 896 P.2d 1292 (1995). The appellate court reviews the record and decision of the administrative body, not that of the superior court. *Bellevue Farm Owners Ass'n v. Shorelines Hearings Bd.*, 100 Wn. App. 341, 997 P.2d 380, *review denied*, 142 Wn.2d 1014, 16 P.3d 1265 (2000).

■ The standard of review for administrative orders is set forth in RCW 34.05.570(3). With respect to issues of law under RCW 34.05.570(3)(d), an appellate court applies a de novo standard, giving substantial weight to the Board's interpretation of the statute it administers. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000). While a reviewing court may accord "deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues," the court is not bound by the agency's conclusions of law. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). The party asserting the error bears the burden of demonstrating that the Board erroneously interpreted or applied the law, or that the Board's order is not supported by substantial evidence. RCW 34.05.570(1)(a); *Cooper Point Ass'n v. Thurston County*, 108 Wn. App. 429, 31 P.3d 28 (2001).

To comply with the Growth Management Act, a comprehensive plan must include a transportation element that establishes a "level of service" standard for all arterial and transit routes.

Each comprehensive plan shall include a plan, scheme, or design for each of the following:

. . . .

(6) A transportation element that implements, and is consistent with, the land use element.

(a) The transportation element shall include the following subelements:

. . . .

(iii) Facilities and services needs, including:

. . . .

(B) Level of service standards for all locally owned arterials and transit routes to serve as a gauge to judge performance of the system. . . .

(C) For state-owned transportation facilities, level of service standards for highways, as prescribed in chapters 47.06 and 47.80 RCW, to gauge the performance of the system.

RCW 36.70A.070(6)(a)(iii)(B), (C).

The Growth Management Act also requires that the City prohibit development that causes a decline in level of service standards. An action-forcing ordinance of this type is known as a concurrency ordinance because its purpose is to assure that development permits are denied unless there is concurrent provision for transportation impacts:

> local jurisdictions must adopt and enforce ordinances which prohibit development approval if the development causes the level of service on a locally owned transportation facility to decline below the standards adopted in the transportation element of the comprehensive plan, unless transportation improvements or strategies to accommodate the impacts of development are made concurrent with the development.

RCW 36.70A.070(6)(b).

A level of service standard is a measure of the degree of intersection saturation, expressed as the ratio of the peak traffic volume at the intersection to the capacity of the intersection to handle traffic. *Sammamish Cmty. Council v. City of Bellevue*, 108 Wn. App. 46, 50, 29 P.3d 728 (2001). A level of service standard constitutes the ratio beyond which the City deems the intersection overly congested. *Sammamish Cmty. Council*, 108 Wn. App. at 50. Because the volume-to-capacity ratio measures whether or not the physical geometry of the roadway provides sufficient capacity for the number of vehicles, a volume-to-capacity ratio of 1.0 or higher means that the intersections are handling traffic in excess of capacity at peak hours. REG'L PROJECT EVALUATION COMM., CONGESTION MANAGEMENT SYSTEM WORK PLAN FOR THE CENTRAL PUGET SOUND REGION 6-7 (1995).

The University subarea plan does not set forth a level of service standard specific to each arterial and transit route. Instead, like the overall Seattle Comprehensive Plan adopted in 1994, the subarea plan employs a screenline methodology to measure congestion. Under Seattle's concurrency ordinance, adopted in 1994, a proposed use or development, to be approved, must demonstrate either that

it will not cause traffic "at an applicable screenline" to exceed the level of service standard for that screenline, or that there is a strategy and financial commitment in place to ensure that the level of service standards will be met "at all applicable screenline(s)" within a specified time frame. SEATTLE MUN. CODE §§ 23.52.004, .006.

Screenline methodology, also referred to as an aggregated roadway level of service standard, is an alternative to traditional individual intersection and roadway segment measures. MUN. RESEARCH & SERVS. CTR. OF WASH., LEVEL OF SERVICE STANDARDS: MEASURES FOR MAINTAINING THE QUALITY OF COMMUNITY LIFE 46 (1994). Instead of expressing a volume-to-capacity ratio for each individual arterial, the aggregated standard approaches traffic problems by considering larger corridors and geographic zones. LEVEL OF SERVICE STANDARDS 46. Screenline methodology is used to promote growth and minimize the effect of stringent level of service standards in target growth areas. LEVEL OF SERVICE STANDARDS 46. The essential concept is that no single intersection or arterial operates in isolation. SEATTLE COMPREHENSIVE PLAN, App. A50. If traffic congestion on one arterial increases, it may not make sense to expand the capacity of that arterial. SEATTLE COMPREHENSIVE PLAN, App. A50. A city, instead, may want to shift traffic to a nearby underused arterial, or to implement measures that will reduce travel demand—or a combination of these strategies. SEATTLE COMPREHENSIVE PLAN, App. A50. Traffic planning that uses a screenline methodology focuses on a "traffic-shed" of inter-related arterials. SEATTLE COMPREHENSIVE PLAN, App. A50.

Seattle's 1994 Comprehensive Plan explains that Seattle selected the screenline methodology because it steps back from the micro-level focus of traditional intersection Level of Service analysis, and recognizes the broader geographic impacts of development and travel patterns. SEATTLE COMPREHENSIVE PLAN, App. A50.

The V/C ratio across a screenline is an indicator of congestion. This method of measurement takes into account that drivers

may make choices within an urban center among arterial streets and alternative modes.

. . . .

The V/C ratio can be used to identify areas where neighborhood or citywide transportation plans could encourage changes in travel behavior (e.g., mode, time of travel, destination) or improve operation of the street (e.g., by changing signal timing and the like). The use of screenlines allows flexibility in selecting improvement measures and locations within the urban center. The capacity of a street or screenline is not a fixed number of vehicles that can never be exceeded. Rather, it is a relative measure of traffic flow.

Arterial screenlines with a V/C ratio exceeding 1.0 now or possibly in the future might warrant attention in a neighborhood plan. High V/C ratios may be tolerable if the result is to shift people into other modes, or is a result of the development densities necessary for a vital urban village.

City of Seattle Ordinance No. 119230 at Attach. 4-7 (Oct. 5, 1998).

The 1994 Seattle Comprehensive Plan combined the Montlake Bridge and the neighboring University Bridge into a single "Ship Canal" screenline, and adopted it as one of the screenlines the City uses to assess concurrency. The subarea plan notes that the volume to capacity ratio on that screenline is presently close to 1.0 in both directions. But increased traffic is unlikely to trigger the concurrency ordinance and its prohibition on further development, because the 1994 plan expressed the level of service standard for the Ship Canal screenline as a relatively high maximum volume-to-capacity ratio of 1.2. The Plan does not project that traffic congestion will reach that level during the 20 years of growth planned for the University Urban Center. SEATTLE COMPREHENSIVE PLAN, App. A53; City of Seattle Ordinance No. 119230 at Attachs. 4-18, 4-19 n.21.

The drawback of the screenline methodology is that it has a recognized tendency to overstate the capacity of a corridor when there is severe traffic congestion or when the alternative routes within the screenline are less desirable. LEVEL

OF SERVICE STANDARDS 47. In 1993, the Montlake Bridge averaged a volume of 60,900 vehicles each weekday compared to 30,400 for the University Bridge, the other component of the screenline. SEATTLE COMPREHENSIVE PLAN App. A39, Transp. Fig. A-3. The Club observes that combining both bridges in one screenline tends to mask the actual level of traffic on the more heavily used Montlake Bridge. Such traffic is likely to remain substantially more congested than is represented by the screenline volume-to-capacity ratio, the Club contends, because Montlake Boulevard (State Route 513) is for most vehicles the only practical access to State Route 520. But because the level of service standard is defined in terms of the screenline average instead of in terms of the Montlake Bridge by itself, traffic on Montlake Bridge can exceed the volume to capacity standard of 1.2 without necessarily forcing Seattle to take action. Thus, the Club's objective in this appeal is an order requiring Seattle to revise the subarea plan by setting traditional level of service standards specific to each arterial, and to adopt a new and separate concurrency ordinance specific to the subarea that will bring about a reduction in traffic across the Montlake Bridge.

The Growth Management Act requires that challenges to a comprehensive plan, or amendments thereto, be filed within 60 days of publication. RCW 36.70A.290(2). The Board ruled that the Club's transportation and concurrency arguments were untimely. "Petitioner's opportunity to challenge the City's 'screenline' LOS [level of service] methodology was five years ago when the City adopted its comprehensive plan in 1994. Petitioner cannot now challenge the City's LOS methodology. . . . Petitioner's opportunity to challenge the City's concurrency ordinance lapsed long before the present challenge was filed." *Montlake Cmty. Club v. City of Seattle*, No. 99-3-0002c, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. & Order at 11-12 (July 30, 1999). The Board commented that it had earlier reviewed the screenline methodology set forth in Seattle's Comprehensive Plan in the context of a timely appeal brought by the West Seattle Defense Fund, and approved it:

Seattle has adopted a level of service methodology and level of service standards for all arterials and transit routes. Furthermore, this LOS methodology does serve as a gauge to allow the City to objectively measure the performance, or lack thereof, of its transportation system.

Final Decision and Order at 11 n.10 (quoting *W. Seattle Def. Fund v. City of Seattle*, No. 94-3-0016, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. & Order (Apr. 4, 1995) (*WSDF* I).

■ Any amendment or revision to the comprehensive plan must conform to the requirements of the Growth Management Act. RCW 36.70A.130. Further, if a subarea plan is adopted, it must be consistent with the comprehensive plan. RCW 36.70A.080(2). The Club contends that the adoption of the subarea ordinance amended the comprehensive plan, or is inconsistent with it, and therefore presents a new opportunity to argue that level of service standards must be specific to each individual arterial. The Club points out that the subarea ordinance creates two new screenlines not found in the comprehensive plan, that no level of service standard is assigned to these new screenlines, and that some of the information contained in the transportation analysis differs from the comprehensive plan—notably, the actual volume to capacity ratios on the Ship Canal screenline are slightly higher.

The Board, however, found that the new materials did not amend the transportation element of the Comprehensive Plan because they did not amend the level of service methodology or standards for the subarea that were originally set forth in the 1994 Comprehensive Plan. We find the Board's conclusion on this issue to be sound. The subarea ordinance and its attachments contained updated information about existing traffic levels, but there was no change in the critical level of service standards—the volume to capacity ratio of traffic on the Ship Canal screenline, which if exceeded will trigger the concurrency ordinance, remains 1.2. The Club's brief on appeal does not demonstrate that the addition of the two new screenlines in the subarea plan

will change the analysis the City adopted in 1994. Moreover, in its brief to the Board, the Club did not focus on the new data and did not argue that the addition of the new screenlines put the subarea plan out of conformity with the Act.

The Club further argues the Board's decision to dismiss the appeal as untimely is in conflict with earlier decisions by the Board with respect to the City's 1994 Comprehensive Plan, and is therefore unfair. The Club claims that in connection with an appeal brought by the West Seattle Defense Fund, the City represented, and the Board agreed, that intersection-specific analysis should be deferred until the adoption of a detailed neighborhood plan. The record does not support this claim. The City's alleged promise referred to "micro-level analysis" of the transportation system and "project-level review of specific development applications." *WSDF* I, No. 94-3-0016, at 59. The Board's alleged agreement is a conclusion that "The City need not provide for localized capital facility and transportation analysis until the hub and residential urban villages are adopted through the neighborhood planning process." *W. Seattle Def. Fund v. City of Seattle*, No. 96-3-0033, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. & Order at 20 (Mar. 24, 1997). We would have to read these statements out of context, and stretch their meaning considerably, in order to conclude that the Board decided intersection-specific analysis was required by the Growth Management Act, but could be deferred until the City was ready to adopt subarea plans.

In summary, because the University subarea plan does not amend or revise the transportation or concurrency elements of the Seattle Comprehensive Plan, and is not inconsistent with it, the Board properly found the Club's appeal to be untimely.

Affirmed.

COLEMAN and KENNEDY, JJ., concur.

Reconsideration denied July 17, 2002.