81 P.3d 918 (2003)
119 Wash.App. 562
The QUADRANT CORPORATION, Appellant,
v.
STATE of Washington GROWTH MANAGEMENT HEARINGS BOARD, an administrative agency of the State of Washington; and Friends of the Law, a Washington nonprofit corporation, Respondents,
v.
King County, a Washington charter County, Respondent Below.
King County, Appellant,
v.
Central Puget Sound Growth Management Hearings Board; Friends of the Law; Coalition for Public Trust; Quadrant Corporation, Respondents.
Friends of the Law, Appellant,
v.
King County, Quadrant Corporation, and Central Puget Sound Growth Management Hearings Board, Respondents, and
Coalition for Public Trust, Additional Party.
Nos. 50043-1-I, 50144-5-I, 50145-3-I.
Court of Appeals of Washington, Division 1.
December 29, 2003.
*920 George Kresovich, Hillis, Clark, Martin & Peterson, Brian Todd, Seattle, WA, for Appellant Quadrant Corporation.
Michael Sinsky, H. Kevin Wright, Deputy Prosecuting Attorneys, for Appellant King County.
David Bricklin, Bricklin Newman Dold, LLP, Seattle, WA, for Appellant Friends of the Law.
Sharon S. Eckholm, Assistant Attorney General, for Respondent Central Puget Sound Growth Management Hearings Board.
*919 BAKER, J.
These consolidated cases arise out of King County's designation of the Bear Creek area as an Urban Growth Area (UGA) in the County's growth management plan. The County also enacted an ordinance designating the property as a fully contained community (FCC). Friends of the Law (Friends) appealed both designations to the Central Puget Sound Growth Management Hearings Board (Board), which overturned the UGA, but upheld the FCC. The parties appealed to superior court, which reversed the Board on both holdings. The parties again appealed to this court. We review the Board's decisions, without regard to the superior court rulings. Because the Board's interpretations of the Growth Management Act[1] were reasonable and were supported by substantial evidence, we vacate the Superior Court's judgment and affirm the Board's decision.

I
This case concerns the future development of 2,500 acres of land (the "Bear Creek island") situated between Redmond and Duvall in east King County. Much of the land surrounding this proposed development is rural, with the Redmond watershed abutting the proposed development to the west. Before the challenged county decisions, the property was designated as rural development. Quadrant, the owner of the property, wishes to develop the land in a comprehensive manner by incorporating commercial, multi-family, and single family units on the site. This cannot be done with a "rural development" designation.[2]
*921 In 1994, King County designated the Bear Creek island as an Urban Growth Area. Friends appealed this decision to the Central Puget Sound Growth Management Hearings Board. The Board first affirmed the County's designation, but on reconsideration reversed King County. The Board ruled that for the development to continue, the County either needed to provide proper justification for its UGA designation or redesignate the development as a fully contained community under RCW 36.70A.350.
Eventually, the parties appealed this decision to the Washington Supreme Court. The Supreme Court remanded "for a determination of whether the County has adequately complied with the terms of the Board's Order on Reconsideration by justifying the Bear Creek urban designation under the terms of the GMA or by redesignating the area as an FCC."[3]
On remand, the Board again determined that the Bear Creek island did not meet the statutory requirements for UGA designation because the property was not "already characterized by urban growth," and not "adjacent to lands characterized by urban growth." But the Board also concluded that the Bear Creek island satisfied the fully contained community (FCC) designation enacted by the County following the Board's earlier remand. All three parties have challenged portions of the Board's order.

II
When reviewing an administrative decision, this court sits in the same position as the superior court, applying the standards found in the Administrative Procedure Act[4] directly to the record before the agency.[5] The standard of review for administrative orders is set forth in RCW 34.05.570(3). With respect to issues of law under RCW 34.05.570(3)(d), we apply a de novo standard, giving substantial weight to the Board's interpretation of the statute it administers.[6]
While a reviewing court owes "deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues," the court is not bound by the agency's conclusions of law.[7] The burden of demonstrating that the Board erroneously interpreted or applied the law, or that the Board's order is not supported by substantial evidence lies on the party asserting the error.[8]

The Growth Management Act
The Legislature created the Growth Management Act (GMA) to control urban sprawl and ensure that "citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning."[9] The GMA requires that counties adopt a comprehensive growth management plan which, among other things, designates Urban Growth Areas (UGAs). UGAs are regions within which urban growth is encouraged and outside of which growth can occur only if it is not urban in nature.[10] The GMA's goals include reducing sprawl, encouraging development in areas already characterized by urban development, preserving open spaces and the environment, and encouraging availability of affordable housing.[11]
The GMA forbids growth that is "urban in nature" outside of the areas designated as UGAs.[12] "[G]rowth that makes intensive use of land for the location of buildings, structures, *922 and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands" is not allowed in areas designated as rural.[13]
The GMA requires counties and cities to allocate land for urban growth based on population projections made by the office of financial management.[14] In addition, the GMA provides that UGAs may be located "outside of a city only if such territory already is characterized by urban growth whether or not the urban growth area includes a city, or is adjacent to territory already characterized by urban growth, or is a designated new fully contained community."[15]

The Friends' Appeal
Friends appeals the superior court's conclusion that the Board must consider probable future development when determining the meaning of "already [is] characterized by urban growth." Friends argues that this statutory language refers to growth already present, whereas King County and Quadrant argue that the phrase contemplates evolving development. They argue that permits already issued for future development must be considered when determining if an area is "already characterized by urban growth."
King County and Quadrant argue that because there will be development on the site, either as a traditional single family subdivision or as a planned unit development, the land is characterized by urban development. They point to the fact that the 1995 Urban Planned Development permit issued for this site authorized development of the entire site with 3,500 single family homes. But this permit was issued after the County's 1994 urban growth area designation, so it cannot retroactively justify that UGA designation.
King County and Quadrant also argue that permits issued in 1988 allow development of 2,000 single family units on the property, and that these vested permits should allow the land to be considered "characterized by urban growth." But the legal concept of vesting in the land use context means that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the applications submission.[16] The concept is not readily transportable to the GMA concept of "already characterized by urban growth," and we are not persuaded that it should be.
Finally, the County and Quadrant argue that their interpretation is "strongly supported by the state's own directives to local government." As support, the County cites to two guidebooks prepared by the Department of Community, Trade, and Economic Development (CTED) which suggest that local governments treat vested developments as already constructed when establishing urban growth area boundaries.
When the Legislature enacted the GMA, it directed the CTED to provide technical assistance to local governments regarding the Act's mandates.[17] WAC 365-195-030, *923 promulgated by CTED, outlines the degree of deference owed by the growth management hearings boards to these recommendations. The code states that the boards must consider planning recommendations set forth in the WAC, but that the boards are not bound by them:
(1) This chapter makes recommendations for meeting the requirements of the act. The recommendations set forth are intended as a listing of possible choices, but compliance with the requirements of the act can be achieved without using all of the suggestions made here or by adopting other approaches.
. . . .
(3) The growth planning hearings boards are authorized to determine, in cases brought before them, whether comprehensive plans or development regulations are in compliance with the goals and requirements of the act. In making such determinations, the boards are required to consider the procedural criteria contained in this chapter. However, compliance with these criteria is not a prerequisite to a finding of compliance with the act.[[18]]
The WAC goes on to set forth criteria for locating a UGA, but does not interpret the meaning of "already characterized by urban growth" or "is adjacent to territory already characterized by urban growth".[19]
In addition to the promulgated regulations, the CTED has also issued a series of guidebooks intended to assist cities and counties with land-use issues. These publications provide easy to understand explanations for various GMA issues.
The first such CTED publication cited by King County suggests that local governments "will probably want to treat land which is committed to a future use similarly to land already developed."[20] The second publication suggests, in a section discussing what other communities have done, that local governments should take into consideration whether

[t]he area is either already developed, firm commitments have been made to development, or the area is located adjacent to existing cities or high-intensity population and employment centers. In addition to actual urban development on the ground, extensive subdivision platting at urban densities may have already occurred.[[21]]
But these guidebooks do not purport to interpret the relevant statute or WAC. They are not legal authority entitled to deference by the Board or this court. Adopting the position advanced by Quadrant and King County could result in different interpretations of the phrase "characterized by urban growth" by different counties. The goals of the GMA are better served by a consistent interpretation of that Act, and the expertise of the GMA hearings board for interpretation of the GMA is a far more reliable basis for achieving such consistency than are the various counties.
The Board concluded that there was no urban growth adjacent to the proposed development, nor was the Bear Creek area already characterized by urban growth. In so concluding, the Board decided that the term "characterized by urban growth" speaks to the built environment, and is used in the present tense. The Board thus rejected an interpretation that speaks to future land uses, even if such uses are probable. The Board also rejected the County's interpretation of "adjacent," explaining that although there was currently some development adjacent to the Bear Creek island, that development was not there when the County approved the UGA designation, and therefore could not be considered.
*924 The Board's interpretations of the GMA lie within its expertise, and we conclude that they are reasonable. We therefore adopt the Board's interpretations as our own.

Alleged Procedural Defects by King County and Quadrant
The Administrative Procedures Act provides the exclusive means for seeking judicial review of agency action.[22] A party seeking judicial review of an agency order must file and serve a petition for review within 30 days of the agency decision.[23] The GMA contains a complementary provision, RCW 36.70A.300, that requires any appeal of a Board decision to be filed in superior court within 30 days.[24]
RCW 36.70A.300 states that a party may appeal a decision by the growth management hearings board within 30 days.[25] It also explains that a party may appeal "as provided in RCW 34.05.514 or [RCW] 36.01.050." But the statute does not explain whether failing to pay the filing fee within the thirty day limit is fatal.
Friends argues that because the County did not pay its filing fee within 30 days, the court did not have jurisdiction. As support, Friends cites to Lewis County v. Western Washington Growth Management Hearings Board.[26] In that case, Division Two of this court interpreted the 30 day limit rigidly, and held that failing either to file or to pay the filing fee within that period results in a jurisdictional defect, and mandates dismissal.[27]
There is no dispute that Quadrant both filed and paid the filing fee within 30 days. Because Quadrant appealed precisely the same issue appealed by King County, we do not need to decide whether to follow Lewis County. There is no prejudice to Friends, because we must consider and decide the same issues in Quadrant's appeal.
Friends next argues that Quadrant failed to serve the Coalition for Public Trust (CPT), and that Quadrant's petition should be dismissed.
We first note that in early proceedings before the Board on the Supreme Court remand, Friends' attorney David Bricklin signed all briefs as "Attorney for Friends of the Law and Coalition for Public Trust." But beginning with Friends' response to Quadrant's motion to dismiss, Friends' attorney began omitting any reference to CPT. In his declaration accompanying his response to Quadrant's motion to dismiss, he stated that he was "attorney for Friends of the Law," and did not mention CPT.
Although Bricklin served as both Friends' and CPT's attorney, he did not notify the other parties or the Board that he had withdrawn as CPT's counsel. When Quadrant filed and served its appeal on Friends' attorney, CPT received that notice.[28]

Quadrant/King County Appeal
The Legislature has established a procedure allowing urban development on lands otherwise failing to satisfy the UGA locational requirements, provided that the requirements in RCW 36.70A.350 are satisfied. These developments, known as fully contained communities (FCC), can have urban densities and services even though the land is not already characterized by urban growth, and is not adjacent to lands characterized by urban growth. The statute sets forth specific requirements that the development must meet, including that the development *925 must be fully contained, and not overflow into surrounding rural areas.[29]
Quadrant and King County appeal the superior court's ruling that the County failed to consider "whether the proposed FCC could be fully contained in fact." The court remanded the issue to the Board to determine whether the FCC designation complies with the general GMA goal of protecting surrounding rural land from urban development.
This issue hinges on what weight the planning goals section of the GMA, found in RCW 36.70A.020, should be given in relation to other, more specific provisions. RCW 36.70A.020 provides general guidelines and goals to "guide the development and adoption of comprehensive plans and development regulations." Among the general goals listed by the statute are reducing sprawl and encouraging urban growth where services are easy to provide or already exist.[30] But there is nothing in the general goals section requiring that an FCC be "fully-contained in fact." The specific requirements governing the designation of a fully contained community are found in RCW 36.70A.350. When there is a conflict between the general goals found in RCW 36.70A.020 and the specific requirements for FCCs found in RCW 36.70A.350, the specific requirements control. Because the County clearly satisfied the specific requirements set forth in RCW 36.70A.350, we vacate the superior court's order of remand and reinstate the Board's decision.
To designate a new FCC, the County must meet specific criteria found in RCW 36.70A.350.[31] Nine specific criteria must be satisfied, including the requirement that the development must be "contained:"
*926 (g) Development regulations are established to ensure urban growth will not occur in adjacent nonurban areas.[[32]]
To ensure that a prospective FCC is contained, the County has enacted several ordinances.[33] For example, properties adjacent to the FCC cannot tie into the sewer service from the FCC.[34]
King County defines an FCC "as a site specific development project consisting of conceptual site plan(s), development standards, processing and other elements, and which is consistent with the criteria provided in RCW 36.70A.350."[35] The County Code states that the purpose of FCCs "is to provide a means to designate a limited number of areas which are uniquely appropriate for conversion to urban development on a large scale basis."[36]
To protect the character of the surrounding rural land, the County's FCC code provision requires that "surrounding properties are classified with rural residential zoning consistent with community plan and comprehensive plan policies in order to restrict future urban development in the area solely to the FCC site."[37] Chapter 21A.39 KCC also requires that in addition to satisfying the FCC permit requirements found in KCC 21A.39.200,[38] the FCC must also satisfy the permit requirements for Urban Planned Developments.
The County Code includes and expands upon the requirements found in RCW 36.70A.350. First, the County Code requires buffers to reduce impact on adjacent lands:
Buffers are provided between the FCC and adjacent urban and low-density residential development. Buffers located on the perimeter boundaries of the FCC delineated boundaries, consisting of either landscaped areas with native vegetation or natural areas, shall be provided and maintained to reduce impacts on adjacent lands.[[39]]
Second, the Code explains with specificity what regulations the County must establish to ensure that urban growth will not spill over into adjacent lands:
Development regulations are established to ensure urban growth will not occur in adjacent nonurban areas. Such regulations shall include but are not limited to rural zoning of adjacent rural areas, urban planned development permit conditions requiring sizing of FCC water and sewer systems so as to ensure urban growth will not occur in adjacent nonurban areas; and/or urban planned development permit conditions prohibiting connection by property owners in the adjacent rural area (excepting public school sites) to new FCC sewer and water mains or lines.[[40]]
This non-exhaustive list sets forth the minimum standards that must be met in order to gain approval of an FCC.
In contrast, the superior court's conclusion that the general goals of the GMA found in RCW 36.70A.020 must specifically be satisfied, and that these generalized goals create a requirement that the FCC be contained in fact, is not supported by the language of the RCW. The RCW explains that the goals "guide the development and adoption of comprehensive plans and development regulations [and] .... are not listed in order of *927 priority and shall be used exclusively for the purpose of guiding the development of comprehensive plans and development regulations."[41]
The Board concluded that "[t]he bear creek FCCs provide substantial benefits and achieve Growth Management Act goals which cannot be duplicated through the UGAs associated with cities in this part of the County." Friends has failed to establish that the Board's decision was erroneous.
We conclude that the first two goals listed in RCW 36.70A.020 are general requirements which do not supersede the more stringent, specific requirements found in RCW 36.70A.350. Because King County satisfied the stringent requirements in RCW 36.70A.350, we affirm the Board's decision.
We reverse the superior court and affirm the Board's conclusion that Bear Creek does not meet the requirements for inclusion in King County's UGA, and the Board's affirmance of the County's designation of Bear Creek as an FCC.
BECKER, C.J., concurs.
COLEMAN, J. (Concurring in part, dissenting in part).
I agree with the majority's opinion in all respects except one. I believe that it is inconsistent with the legislature's intent and the Growth Management Act (GMA) to exclude land subject to vested development applications from consideration when determining what territories to include in an urban growth area. Although this question is largely academic because of this court's conclusion that the Bear Creek Island area was properly designated urban as a fully contained community, I write separately because, in light of the stated purposes and mandates of the GMA, greater deference should be paid to King County's decision to designate Bear Creek Island as urban.
The GMA was enacted to reduce sprawling, low-density development and encourage development in urban areas. Association of Rural Residents v. Kitsap County, 141 Wash.2d 185, 197-98, 4 P.3d 115 (2000). One of the means of accomplishing these goals was to designate urban growth areas (UGA's) under RCW 36.70A.110(1) to concentrate growth in particular areas. RCW 36.70A.110(1) allows only the following types of territories to be designated as urban:
 Territory that is "already characterized by urban growth"
 Territory that is adjacent to territory that is already characterized by urban growth; and
 Territory designated as a new "fully contained community."
"Urban growth" is a defined term, explained in RCW 36.70A.030(17) as follows:
"Urban growth" refers to growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands designated pursuant to RCW 36.70A.170. A pattern of more intensive rural development, as provided in RCW 36.70A.070(5)(d), is not urban growth. When allowed to spread over wide areas, urban growth typically requires urban governmental services. "Characterized by urban growth" refers to land having urban growth located on it, or to land located in relationship to an area with urban growth on it as to be appropriate for urban growth.
The Central Puget Sound Growth Management Hearings Board (Board) determined that "characterized by urban growth" is a phrase that must be applied in the present tense and that refers to the actual built environment. I agree with the first part of the Board's conclusion  the language in RCW 36.70A.110(1) certainly applies in the present tense  but the Board's interpretation of "urban growth" as applying only to physical structures on the land, and not taking into account completed development applications, is erroneous.
The statutory definition of "urban growth" does not compel the conclusion that the legislature was referring solely to physical structures upon the land. The definition is somewhat *928 circular, but it states that "`[u]rban growth' refers to growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces." The plain meaning of "growth," is "the process of growing." This language is sufficiently amorphous to take in account the various stages of development that can occur, from idea, to planning, to application, and finally to construction. Had the legislature intended to limit counties to consideration of physical man-made structures, it could have done so, but it did not. It could also have avoided the demonstrative term "refers to," by using more limiting, exclusive language. Under the definition approved by the legislature, territory already committed to the process of growing in a manner incompatible with rural uses can be considered for an urban designation, and indeed it would be inconsistent with the goals of the GMA not to. It can also be argued that the use of the term "characterized by" contemplates a broader, more abstract approach to determining what areas should be designated as urban. While there is always a possibility that construction may never occur, an area of land already committed to urban development from the County's perspective bears characteristics of urban use that should not be ignored in the planning process. Here, the County recognized that a rural designation would not prevent construction of "additional sprawling, suburban-style subdivisions" consisting of more than 2,000 one acre lots vested under the pre-GMA completed applications. Consequently, it determined that it was preferable to designate Bear Creek Island as urban to allow for more concentrated growth in an urban planned development that would further the GMA goals of protecting the environment, reducing sprawl, and providing affordable housing.
The Washington State Department of Community Development (CDC), the state agency formed to provide GMA guidance to local governments and promulgate regulations, has issued two publications supporting this interpretation. In advising cities and counties on the potential confusion surrounding how to treat vested development applications during the UGA designation process, the CDC endorsed inclusion of subdivided developments, whether built or unbuilt, in UGAs as a logical and effective means of furthering the goals of the GMA. Specifically, it advised that vested development applications should be treated as already constructed for the purpose of deciding which lands to include in UGAs. Although the CDC publications are not entitled to deference as a matter of law, their expertise and the uniformity they have provided should be acknowledged in this complex area of the law.
Lastly, the legislature foresaw that the counties and cities planning for growth would be faced with many difficult decisions affected by a multitude of factors unique to each region. RCW 36.70A.3201 contains a statement of intent that reflects a high degree of deference to the actions of counties and cities, consistent with the requirements and goals of the GMA. It states:
In amending RCW 36.70A.320(3) by section 20(3), chapter 429, Laws of 1997, the legislature intends that the boards apply a more deferential standard of review to actions of counties and cities than the preponderance of the evidence standard provided for under existing law. In recognition of the broad range of discretion that may be exercised by counties and cities consistent with the requirements of this chapter, the legislature intends for the boards to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter. Local comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances. The legislature finds that while this chapter requires local planning to take place within a framework of state goals and requirements, the ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community.
RCW 36.70A.320(3) acknowledges that counties must balance priorities and options for action in "full consideration of local circumstances," yet the Board's decision here seeks to artificially deprive the County of the right *929 to fully consider local circumstances. In the absence of a definition of "urban growth" that limits counties to considering only completed construction when designating UGAs, it appears contrary to the goals of the GMA to interpret "urban growth" in a manner that would promote sprawl. I therefore respectfully dissent.
NOTES
[1] Ch. 36.70A RCW.
[2] See RCW 36.70A.030(15) (defining "rural development" as development outside the UGA).
[3] King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wash.2d 161, 186, 979 P.2d 374 (1999).
[4] Ch. 34.05 RCW.
[5] Montlake Cmty. Club v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 110 Wash.App. 731, 734, 43 P.3d 57 (2002).
[6] King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000).
[7] City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998).
[8] RCW 34.05.570(1)(a); The Cooper Point Assn. v. Thurston County, 108 Wash.App. 429, 436, 31 P.3d 28 (2001), aff'd, 148 Wash.2d 1, 57 P.3d 1156 (2002).
[9] King County, 138 Wash.2d at 166-67, 979 P.2d 374 (quoting RCW 36.70A.010).
[10] RCW 36.70A.110(1).
[11] See RCW 36.70A.020.
[12] RCW 36.70A.110(1).
[13] RCW 36.70A.030(17).
[14] RCW 36.70A.110(2).
[15] RCW 36.70A.110(1).
[16] Noble Manor Co. v. Pierce County, 133 Wash.2d 269, 275, 943 P.2d 1378 (1997).
[17] The relevant portion of the GMA provides that:

(1) The department shall establish a program of technical and financial assistance and incentives to counties and cities to encourage and facilitate the adoption and implementation of comprehensive plans and development regulations throughout the state.
. . . .
(4) The department shall establish a program of technical assistance:
(a) Utilizing department staff, the staff of other state agencies, and the technical resources of counties and cities to help in the development of comprehensive plans required under this chapter. The technical assistance may include, but not be limited to, model land use ordinances, regional education and training programs, and information for local and regional inventories; and
(b) Adopting by rule procedural criteria to assist counties and cities in adopting comprehensive plans and development regulations that meet the goals and requirements of this chapter. These criteria shall reflect regional and local variations and the diversity that exists among different counties and cities that plan under this chapter.
RCW 36.70A.190.
[18] WAC 365-195-030.
[19] WAC 365-195-340(1)(c).
[20] Susan C. Enger, Department of Community Development Growth Mgmt. Division, Issues in Designating Urban Growth Areas, Part I, at 5 (1992).
[21] Susan C. Enger, Department of Community Development Growth Mgmt. Division, The Art and Science of Designating Urban Growth Areas, Some Suggestions for Criteria and Densities, Part II, at 4 (1992).
[22] RCW 34.05.510.
[23] RCW 34.05.542(3).
[24] RCW 36.70A.300(5).
[25] "Any party aggrieved by a final decision of the hearings board may appeal the decision to superior court as provided in RCW 34.05.514 or 36.01.050 within thirty days of the final order of the board." RCW 36.70A.300(5).
[26] 113 Wash.App. 142, 53 P.3d 44 (2002).
[27] Lewis County, 113 Wash.App. at 154, 53 P.3d 44.
[28] We also note that there is no evidence that CPT was a party to the proceedings. The Board order on Supreme Court remand does not list it on the service list. None of Friends' briefs or motions were sent to CPT after its prehearing brief. There is no indication that CPT was a party, and therefore needed to be served.
[29] RCW 36.70A.350. The relevant portion provides:

(1) A new fully contained community may be approved in a county planning under this chapter if criteria including but not limited to the following are met:
. . . .
(g) Development regulations are established to ensure urban growth will not occur in adjacent nonurban areas;
(h) Provision is made to mitigate impacts on designated agricultural lands, forest lands, and mineral resource lands.
RCW 36.70A.350(1)(g)-(h).
[30] The relevant portion of the statute provides:

The following goals are adopted to guide the development and adoption of comprehensive plans and development regulations of those counties and cities that are required or choose to plan under RCW 36.70A.040. The following goals are not listed in order of priority and shall be used exclusively for the purpose of guiding the development of comprehensive plans and development regulations:
(1) Urban growth. Encourage development in urban areas where adequate public facilities and services exist or can be provided in an efficient manner.
(2) Reduce sprawl. Reduce the inappropriate conversion of undeveloped land into sprawling, low-density development.
RCW 36.70A.020(1)-(2).
[31] RCW 36.70A.350 provides:

A county ... may establish a process as part of its urban growth areas
... for reviewing proposals to authorize new fully contained communities located outside of the initially designated urban growth areas.
(1) A new fully contained community may be approved ... if criteria including but not limited to the following are met:
(a) New infrastructure is provided for and impact fees are established consistent with the requirements of RCW 82.02.050;
(b) Transit-oriented site planning and traffic demand management programs are implemented;
(c) Buffers are provided between the new fully contained communities and adjacent urban development;
(d) A mix of uses is provided to offer jobs, housing, and services to the residents of the new community;
(e) Affordable housing is provided within the new community for a broad range of income levels;
(f) Environmental protection has been addressed and provided for;
(g) Development regulations are established to ensure urban growth will not occur in adjacent nonurban areas;
(h) Provision is made to mitigate impacts on designated agricultural lands, forest lands, and mineral resource lands;
(i) The plan for the new fully contained community is consistent with the development regulations established for the protection of critical areas by the county pursuant to RCW 36.70A.170.
[32] RCW 36.70A.350(g).
[33] See KCC 21A.08.030-100, KCC 13.24.132, KCC 13.24.134 (requiring sewer lines crossing rural lands to be tightlined to prevent rural properties from hooking up to the lines); KCC 21A.39.200(B)(7) (requiring appropriate containment conditions to be established for FCCs, including utility sizing and connection restrictions).
[34] KCC 13.24.132.
[35] KCC 21A.06.533.
[36] KCC 21A.38.110(A).
[37] KCC 21A.38.110(B)(2).
[38] KCC 21A.39.200(B) explains:

In order to be approved, a proposed FCC permit shall comply with the provisions relating to urban planned development permits in King County Code 21A.39.020B and C and 21A.39.030 through 21A.39.130, except that a proposed FCC shall comply with the following additional standards....
[39] KCC 21A.39.200(B)(3) (emphasis added) (underlined portion not found in RCW, added by King County).
[40] KCC 21A.39.200(B)(7) (emphasis added) (underlined portion not found in RCW, added by King County).
[41] RCW 36.70A.020 (emphasis added).