[No. 75076-9. En Banc.]
Argued January 13, 2005. Decided May 5, 2005.

THE QUADRANT CORPORATION, *Petitioner*, v. THE CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD ET AL., *Respondents*.

KING COUNTY, *Petitioner*, v. THE CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD ET AL., *Respondents*.

FRIENDS OF THE LAW, *Petitioner*, v. KING COUNTY ET AL., *Respondents*.

226

*George A. Kresovich, Richard R. Wilson,* and *Brian D. Todd* (of *Hillis Clark Martin & Peterson, P.S.*), for The Quadrant Corporation.

*Norm Maleng, Prosecuting Attorney,* and *H. Kevin Wright* and *Michael J. Sinsky, Deputies,* for King County.

*David A. Bricklin* (of *Bricklin Newman Dold, L.L.P.*), for Friends of the Law.

*Robert M. McKenna, Attorney General,* and *Martha P. Lantz, Assistant,* for the Central Puget Sound Growth Management Hearings Board.

*Samuel A. Rodabough* on behalf of Building Industry Association of Washington and Pacific Legal Foundation, amicus curiae.

*John T. Zilavy* on behalf of 1000 Friends of Washington, amicus curiae.

*Janice E. Ellis, Prosecuting Attorney,* and *John R. Moffat, Deputy,* on behalf of Snohomish County, amicus curiae.

¶1 BRIDGE, J. — Once again we are confronted with a conflict between competing powers under the Growth Management Act (GMA), chapter 36.70A RCW. This time the controversy concerns King County's designation of approximately 2,500 acres of land situated between Redmond and Duval in King County as an urban growth area (UGA), and subsequently, in the alternative, as a fully contained community (FCC).

¶2 The question raised is whether King County's actions complied with the GMA. King County first designated the area as a UGA in its original 1994 comprehensive plan. Since that time, there have been numerous protracted legal challenges to that designation, principally initiated by a citizens' group, Friends of the Law (FOTL). This is the second challenge to reach this court and comes to us following our remand to the Central Puget Sound Growth Management Hearings Board (Board). On remand from this court in that earlier case, the Board ruled that King County's justification for its designation of the Bear Creek area as a UGA was insufficient because it failed to meet the requirements of the GMA but that King County's designation of the Bear Creek area as an FCC complied with the applicable GMA requirements. The superior court then reversed the Board on both grounds. A divided Court of Appeals, however, reversed the superior court on both grounds and reinstated the Board's initial order. King County, Quadrant Corporation, and FOTL all sought review here and we granted all three petitions.

¶3 We now address the Court of Appeals decisions, affirming in part, and reversing in part. We hold, first, that counties and cities planning under the GMA may consider vested development rights when determining whether an area "already is characterized by urban growth" according to the GMA (RCW 36.70A.110(1)) and second, that the Board correctly concluded that King County met all requirements under the GMA to designate the Bear Creek area an FCC.

# I

## Facts and Procedural History

¶4  In 1988, before the adoption of the GMA, King County issued permits for the subdivision and development of two large tracts of land which now account for the majority of the Bear Creek area. Then in 1990 and 1991 the legislature enacted the GMA, requiring counties to adopt comprehensive plans and designate UGAs.[1] King County responded, engaging in a thorough, multijurisdictional deliberative process through the Growth Management Planning Council (GMPC).[2] Regional consensus was achieved, and pursuant to RCW 36.70A.210, King County adopted county-wide planning policies (CPP) which designated the Bear Creek area as a UGA. *See* Resp. Br. of King County at 3-7. Consistent with the CPPs, in 1994 King County adopted its comprehensive plan, designating the Bear Creek area as a UGA.

¶5  FOTL challenged King County's designation of the Bear Creek area as a UGA in a petition to the Board. The Board ruled that King County's designation did not comply with the GMA, but refused to invalidate the UGA designation and instead remanded the issue to the county to, at its discretion, (1) remove the UGA designation, (2) justify the UGA designation pursuant to the requirements of RCW 36.70A.110, or (3) redesignate the area an FCC pursuant to RCW 36.70A.350.[3] King County took alternative means to comply with the Board's order. It appealed the Board's ruling, sought to establish justification for the area's designation as a UGA, and redesignated the area, through

---

[1] *See* Growth Management Act, LAWS OF 1990, 1st Ex. Sess., ch. 17 and LAWS OF 1991, 1st Spec. Sess., ch. 32.

[2] *See* Resp. Br. of King County at 3 n.5 (describing GMPC as a council created by interlocal agreement between and among King County and the cities therein and charged with adopting county-wide planning policies); *see also* RCW 36.70A.210.

[3] *Compare* RCW 36.70A.300 (effect of finding of noncompliance) *with* RCW 36.70A.302 (effect of determination of invalidity).

county ordinance and an amendment to its comprehensive plan, as an FCC.

¶6 FOTL appealed both the UGA designation and the issuance of development permits in the area. In response, King County asserted that it was bound by its CPPs to include the Bear Creek urban planned development in its UGA. The superior court and the Court of Appeals agreed with the county, finding that the UGA designation was mandated by the CPPs and that the permits were valid. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn.2d 161, 166-69, 979 P.2d 374 (1999). On review before this court in 1999, we affirmed the Court of Appeals' denial of FOTL's challenge to the issuance of development permits but held that the validity of the county's designation of the area as a UGA was not mandated by the CPPs and therefore subject to administrative review. *Id.* at 186. We remanded to the Board "for a determination of whether the County has adequately complied with the terms of the Board's Order . . . by justifying the Bear Creek urban designation under the terms of the GMA or by redesignating the area as an FCC." *Id.* at 186.

¶7 On remand, FOTL contested both King County's justification of the UGA and its redesignation of the area as an FCC. The Board unanimously ruled that the county had failed to justify its UGA designation because the relevant statutory requirement that the UGA be "characterized by urban growth" could include only the actual built environment and not prospective future development. As to the second issue, a divided Board upheld the county's redesignation of the area as an FCC, the majority finding that the county complied with the all the requirements of RCW 36.70A.350 to permit the approval of an FCC.[4]

¶8 The parties appealed to King County Superior Court, which consolidated the appeals, and reversed the Board on both issues finding (1) that counties may consider vested

---

[4] Board member Trover, dissenting, opined that the designation did not comply with the GMA requirements for FCCs because the area cannot *in fact* be "fully contained." Clerk's Papers (CP) at 65-74.

rights to future development when determining whether an area is characterized by urban growth and (2) that the FCC designation failed to comply with the GMA because it violated one of the GMA's principle goals of reducing sprawl.

¶9 On appeal to Division One, the Court of Appeals reinstated the Board's ruling. The court unanimously determined that the Board correctly found that King County complied with the GMA in designating the area as an FCC. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 119 Wn. App. 562, 572, 81 P.3d 918 (2003). By a 2-1 decision, it found that the Board's interpretations of the GMA with regard to the UGA designation "lie within its expertise, and . . . conclude[d] that they [were] reasonable." *Id.* As such it upheld the Board's determination that the term " 'characterized by urban growth' " refers only to the "built environment." *Id.* Judge H. Joseph Coleman disagreed and opined that in light of the stated purposes and mandates of the GMA, greater deference should have been paid to King County's decision to designate the area a UGA, reasoning that it was inconsistent with the legislature's intent and the goals of the GMA to preclude counties from considering vested development applications when determining which areas to include in a UGA. *Id.* at 578-79 (Coleman, J., concurring/dissenting).

¶10 Not surprisingly, all three parties petitioned this court for review which we granted.

II

Analysis

GMA Background

¶11 The legislature enacted the GMA in 1990 and 1991 largely " 'in response to public concerns about rapid population growth and increasing development pressures in the state, especially in the Puget Sound region.' " *King County*

*v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 546, 14 P.3d 133 (2000) (quoting Alan D. Copsey, *Including Best Available Science in the Designation and Protection of Critical Areas Under the Growth Management Act*, 23 SEATTLE U. L. REV. 97, 97 (1999)). After decades of lax and optional land use regulations,[5] the legislature's stated intent was to combat "uncoordinated and unplanned growth." RCW 36.70A.010. One of the central requirements of the GMA, and the one at issue here, is that counties and cities which plan under it must designate UGAs "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). In addition, planning counties were required to adopt a "county-wide planning policy in cooperation with the cities located in whole or in part" within its boundaries. RCW 36.70A.210(2). These CPPs were designed to promote coordinated and orderly planning. *See* RCW 36.70A.210(3).

¶12 The GMA created three growth management hearings boards to hear and review challenges to county and city actions under the GMA. *See* RCW 36.70A.250 through .340. In addition the legislature appointed the Department of Community, Trade, and Economic Development to provide technical assistance to counties and cities in adopting and implementing their comprehensive plans and development regulations. *See* RCW 36.70A.050, .190.

¶13 Relevant here, the GMA, at its inception, was "riddled with politically necessary omissions, internal inconsistencies, and vague language." Richard L. Settle, *Washington's Growth Management Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 8 (1999). This troubled beginning "spawned statutory ambiguity about the locus of the line between state mandate and local policy discretion" in fashioning UGAs. *Id.* at 49. While the growth management hearings boards "generally have resolved the ambiguity in favor of state mandate, expansively interpreting

---

[5] *See* Richard L. Settle, *Washington's Growth Management Revolution Goes to Court,* 23 SEATTLE U. L. REV. 5, 6-7 (1999).

the Act to effectuate these central goals[,] [t]he legislature has responded with GMA amendments affording greater discretion to counties and cities." *Id.* (footnote omitted); *see* LAWS OF 1997, ch. 429, §§ 2, 20. Notably, these 1997 amendments to the GMA placed the onus on local jurisdictions to "balance priorities and options for action in full consideration of local circumstances" and pointedly amended the threshold for a finding of noncompliance from the "preponderance of the evidence" standard to requiring the action be "clearly erroneous." LAWS OF 1997, ch. 429, §§ 2, 20 (codified at RCW 36.70A.320(3), .3201).

## Standard of Review

■ ■ ¶14 The Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of challenges to board actions. *See, e.g., King County,* 142 Wn.2d at 552. Under the APA, the "burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). RCW 34.05.570(3) establishes nine bases on which a party may challenge an agency's actions. All three parties here challenge the actions of the Board based on RCW 34.05.570(3)(d), asserting that the Board "erroneously interpreted or applied the law." We review issues of law under RCW 34.05.570(3)(d) de novo. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). In doing so, we have previously stated that "[w]e accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute." *Id.* The proper application of this deference is disputed here and is analyzed in full in the context of the parties' claims below.

## "Already Is Characterized by Urban Growth"

¶15 We address first the issue of whether, under the GMA, a county may consider vested or planned future developments in determining if an area "already is charac-

terized by urban growth." The relevant statute permitting UGA designations for areas characterized by urban growth provides, in part, that "[a]n urban growth area may include territory that is located outside of a city only if such territory already is characterized by urban growth whether or not the urban growth area includes a city." RCW 36-.70A.110(1). The GMA defines "[c]haracterized by urban growth" somewhat circularly as "land having urban growth located on it." RCW 36.70A.030(17). It additionally defines "[u]rban growth" as

> growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands designated pursuant to RCW 36.70A.170.

*Id.*

¶16 The parties here dispute whether the Bear Creek area "already [was] characterized by urban growth" when King County designated it as a UGA in its 1994 comprehensive plan. Following the original challenge to the UGA designation, King County responded to the Board's request that it justify the UGA designation by asserting, in part, that the area was "characterized by urban development" at the time King County adopted its comprehensive plan. *See* Resp. Br. of King County, App. C at 9 (Justification of the Urban Designation of the Bear Creek UPD Sites). King County determined that the 1988 subdivision applications "authorized the creation and development of an urban residential development" at densities of approximately one unit per acre and that King County and the GMPC reasoned that designating the area a UGA "was preferable to additional sprawling, suburban-style subdivisions." *Id.* at 3-4. Having concluded that growth was occurring and inevitable, the county determined that "it would have been imprudent and irresponsible to ignore this fact in planning for the future of the Bear Creek subarea." *Id.* at 8. FOTL

challenged the sufficiency of this justification before the Board. Clerk's Papers (CP) at 41-44.

¶17 King County and Quadrant assert that the phrase "already is characterized by urban growth" encompasses both present and future developments and that, accordingly, counties and cities should be permitted to consider vested development applications and issued permits in determining whether a given area is in fact characterized by urban growth.[6] The superior court agreed, but the Board and a majority of the Court of Appeals disagreed, determining that the relevant definitions "speak to the built environment and are in the present tense," and as such "do not contemplate prospective urban development." CP at 42-43; *see also Quadrant Corp.*, 119 Wn. App. at 566-72. FOTL asserts here that the Board's interpretation is correct and entitled to " 'substantial weight' " on review. FOTL Answer to Pets. for Review at 3 (quoting *Thurston County v. Cooper Point Ass'n*, 148 Wn.2d 1, 14-15, 57 P.3d 1156 (2002)).

¶18 The Board's conclusion that the relevant definitions "speak to the built environment and are in the present tense," and as such "do not contemplate prospective urban development," CP at 42-43, is not sustainable. In reaching this conclusion, the Board makes three errors: (1) it fails to abide by the legislature's mandated deference to county planning actions consistent with the GMA, (2) it fails to adequately address the definition of the pivotal term "growth" as used in the GMA, and (3) it fails to take into account the legal consequences of vesting.

¶19 (1) Deference: First, as noted above, the parties dispute the proper degree of deference that should be afforded the boards and the local jurisdictions, respectively,

---

[6] FOTL contends that the applications at issue are not in fact "vested" and on that ground should not serve as basis for King County's consideration. The Board acknowledged in its order that the parties disputed the vested nature of the one-acre lots, but considered it irrelevant to the Board's analysis. CP at 44 n.7. As such, the issue does not appear to be properly before the court as it was neither addressed nor resolved by the Board. *See King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 91 Wn. App. 1, 29-30, 951 P.2d 1151 (1998), *rev'd in part on other grounds*, 138 Wn.2d 161, 979 P.2d 374 (1999); *see also infra* at 247-48.

on review. FOTL asserts that "substantial weight" should be given to the Board's interpretation of the statute it is charged with "administering," while King County and Quadrant respond that this is the very type of situation the legislature had in mind when it amended RCW 36.70A.320 to grant enhanced deference to county planning decisions. *See* LAWS OF 1997, ch. 429, §§ 2, 20; *see also* Settle, *supra*, at 49 (commenting that these amendments "responded" to board interpretations resolving ambiguity in favor of state mandates by "affording greater discretion to counties and cities").

¶20 Quadrant contends that the GMA compels the boards and reviewing courts to defer to a county's exercise of discretion in planning under the GMA. Suppl. Br. of Quadrant at 14-18. Quadrant maintains that RCW 36.70A.3201 establishes a "clear directive" that deference should be afforded county and city planning decisions, especially when weighing "local circumstances," *id.* at 14; RCW 36.70A.3201, and that King County was within the "broad range of discretion" the GMA affords in designating the area a UGA. RCW 36.70A.3201. King County concurs. FOTL counters that local jurisdictions are entitled to limited deference. It rationalizes that "[g]iving deference to choices made *within* the Act's strictures is far different than giving deference to local governments' interpretations of the meaning of the Act itself." FOTL Answer to Snohomish County Amicus Br. at 3-4.

¶21 Contrary to FOTL's arguments, the GMA contains numerous provisions which tend to show that local jurisdictions have broad discretion in adapting the requirements of the GMA to local realities. Comprehensive plans and development regulations under the GMA "are presumed valid upon adoption." RCW 36.70A.320(1). With regard to challenges to county actions under the GMA, the GMA places the "burden . . . on the petitioner to demonstrate that any action taken by a . . . county, or city . . . is not in compliance with the requirements of [the GMA]." RCW 36.70A.320(2). While the legislature established three

growth management hearings boards to administer and enforce the GMA, *see* RCW 36.70A.250, the legislature instructed the boards to afford broad deference to determinations made by local jurisdictions in planning under the GMA and that the boards "*shall* find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of this chapter." RCW 36.70A.320(3) (emphasis added). To find a county's actions are " 'clearly erroneous,' " we have stated that the board "must be 'left with the firm and definite conviction that a mistake has been committed.' " *King County,* 142 Wn.2d at 552 (quoting *Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County,* 121 Wn.2d 179, 201, 849 P.2d 646 (1993)).

¶22 In 1997, the legislature took the unusual additional step of enacting into law its statement of intent in amending RCW 36.70A.320 to accord counties and cities planning under the GMA additional deference. *See* RCW 36.70A.3201.

In amending RCW 36.70A.320(3) . . . *the legislature intends that the boards apply a more deferential standard of review to actions of counties* and cities than the preponderance of the evidence standard provided for under existing law. *In recognition of the broad range of discretion that may be exercised by counties and cities consistent with the requirements of this chapter, the legislature intends for the boards to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter.* Local comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances. The legislature finds that while this chapter requires local planning to take place within a framework of state goals and requirements, the *ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community.*

*Id.* (emphasis added). In addition, even a board's finding of "noncompliance" with the GMA's requirements results only in an order specifying a time frame within which the county

or city shall comply with such requirements, board monitoring of such progress, and a subsequent compliance hearing. RCW 36.70A.300(3)(b), .330.

¶23 In the face of this clear legislative directive, we now hold that deference to county planning actions, that are consistent with the goals and requirements of the GMA, supersedes deference granted by the APA and courts to administrative bodies in general.[7] *See, e.g., State v. Bradshaw*, 152 Wn.2d 528, 535, 98 P.3d 1190 (2004) (general desire of legislature to promote uniformity must give way to legislature's specific direction), *cert. denied*, 544 U.S. 922 (2005); *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 24, 978 P.2d 481 (1999) (holding specific provisions must prevail over more general statutes). While we are mindful that this deference ends when it is shown that a county's actions are in fact a "clearly erroneous" application of the GMA, we should give effect to the legislature's explicitly stated intent to grant deference to county planning decisions. Thus a board's ruling that fails to apply this "more deferential standard of review" to a county's action is not entitled to deference from this court.

■ ■ ¶24 (2) "Growth" in the GMA: With these principles in mind, we turn to the construction and application of RCW 36.70A.110(1), at issue here. We have previously acknowledged that, in interpreting the GMA, as in other matters of statutory construction, " 'the Supreme Court is the final arbiter.' " *King County*, 142 Wn.2d at 555 (quoting *Nat'l Elec. Contractors Ass'n*, 138 Wn.2d at 19). " 'The primary goal in statutory interpretation is to ascertain and give effect to the intent of the Legislature.' " *Id.* (quoting *Nat'l Elec. Contractors Ass'n*, 138 Wn.2d at 19). To discern legislative intent, "the court begins with the statute's plain

---

[7] *Compare* RCW 36.70A.320 and .3201 (mandating boards apply a "more deferential" "clearly erroneous" standard of review to county or city planning action), *with* RCW 34.05.570 (APA standards of judicial review) *and City of Redmond*, 136 Wn.2d at 46 (noting that courts should " 'accord[ ] substantial weight' " to agency interpretations of laws they are charged with administering) (quoting *Overton v. Econ. Assistance Auth.*, 96 Wn.2d 552, 555, 637 P.2d 652 (1981)).

language and ordinary meaning" but also looks to the applicable legislative enactment as a whole, harmonizing its provisions by reading them in context with related provisions and the statute as a whole. *Id.* at 555, 560.

¶25 As the legislature has not specifically defined the term "growth" as used in the GMA, we apply its common meaning, which may be determined by referring to a dictionary. *Dahl-Smyth, Inc. v. City of Walla Walla,* 148 Wn.2d 835, 842-43, 64 P.3d 15 (2003). *Webster's* defines "growth" as a "stage in the process of growing" or simply "the process of growing." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1005 (1971). These definitions establish that "growth" may be a progressive notion that does not simply refer to the "built environment." The present versus future tense dichotomy relied on heavily by the Board and the Court of Appeals remains relevant but only in its relationship to the determinative phrase "characterized by urban *growth.*" RCW 36.70A.110(3) (emphasis added). For example, an area could still be *presently* characterized by growth regardless of whether that "growth" presently consists only of vested development rights, partially completed subdivisions, or completed urban neighborhoods.

¶26 In addition to dictionary definitions, we also "give careful consideration to the subject matter involved, the context in which the words are used, and the purpose of the statute." *City of Tacoma v. Taxpayers of Tacoma,* 108 Wn.2d 679, 693, 743 P.2d 793 (1987). The GMA was designed to establish a process of "growth management" and to counter "uncoordinated and unplanned growth." RCW 36.70A.010; *see also generally* ch. 36.70A RCW. The GMA, while providing some substantive requirements, essentially requires certain counties and cities to plan for and manage growth, mandating above all that they engage in a deliberative process, consistent with the requirements and goals of the GMA. *Id.* Limiting the term "growth" to simply the built environment unnecessarily constrains the ability of local jurisdictions to plan and manage for imminent and inevitable growth. This is inconsistent with legislative intent.

¶27 Considering the discretion afforded counties to plan, "in full consideration of local circumstances," RCW 36.70A.3201, King County's decision to consider vested applications and development rights to determine that the Bear Creek area "already [was] characterized by urban growth" was not a clearly erroneous application of the GMA.[8] The legislature intended to grant counties deference in "how [they] *plan*[ ] *for growth*," *Cooper Point Ass'n*, 148 Wn.2d at 14 (emphasis added), and to hold otherwise would lead to a construction inconsistent with the legislature's intent. In many ways King County and Quadrant have shown here that the designation of the Bear Creek area as a UGA was designed to further the GMA's goals and was in fact the very type of planning and management the GMA endeavored to encourage.[9]

¶28 (3) Vested Rights: Finally, the Board failed to take into account the legal consequences of vesting. The vested rights doctrine establishes that land use applications vest on the date of submission and entitle the developer to divide and develop the land in accordance with the statutes and ordinances in effect on that date. *See Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 278-80, 943 P.2d 1378 (1997); *see also* RCW 58.17.033 (extending vested rights doctrine to preliminary plat applications). Here the Board determined that counties may only consider the "built environment." CP at 42. The Court of Appeals agreed. *Quadrant Corp.*, 119 Wn. App. at 572. In dissent, Judge

---

[8] This case is easily distinguishable from those cases where we have declined to afford deference to county actions that violate GMA requirements. *See Cooper Point Ass'n*, 148 Wn.2d at 14. In *Cooper Point Ass'n*, the county's proposed action violated a specific statutory mandate: extending urban services into a rural area in contravention of RCW 36.70A.110(4). *Id.* Thus, this court refused to defer to county's decision where the "County's proposal [did] just what the GMA prohibits." *Id.* Here, King County does not propose acting in a manner that clearly violates the GMA's statutory requirements.

[9] King County's designation of the Bear Creek area as a UGA was the result of a thoughtful, deliberative, and interjurisdictional process. *See* Admin. R., Index 33, Ex. 18, 29-37. The decision whether to designate the Bear Creek area as a UGA in the CPPs, and later King County's comprehensive plan, followed extensive debate, political compromise, and a weighing of the benefits and consequences of the results of such a designation or lack thereof. *See id.*

Coleman framed the relevance of the vested rights doctrine in the planning process:

> Under the definition [of "urban growth"] approved by the legislature, territory already committed to the process of growing in a manner incompatible with rural uses can be considered for an urban designation, and indeed it would be inconsistent with the goals of the GMA not to. . . . While there is always a possibility that construction may never occur, an area of land already committed to urban development from the County's perspective bears characteristics of urban use that should not be ignored in the planning process.

*Id.* at 580 (Coleman, J., concurring/dissenting). The Board's decision unreasonably precludes local jurisdictions from considering vested rights to divide and develop the land and essentially forces counties, in adopting comprehensive plans, to ignore the likelihood of future development. The Board's failure to reconcile the statutory planning process with Washington's vested rights doctrine resulted in a strained interpretation that does not further the legislature's intent in establishing the GMA.

¶29 Thus, we reverse the Court of Appeals and hold the Board erred in ruling King County failed to comply with the GMA when King County considered vested subdivision applications in determining whether an area "already [was] characterized by urban growth."

## "Fully Contained Community"

¶30 We now turn to the issue of whether King County's designation of the Bear Creek area as an FCC under the GMA complied with the GMA's requirements for such designations. In response to the Board's 1995 order on reconsideration finding that the Bear Creek area's UGA designation failed to comply with the GMA, King County amended its comprehensive plan, redesignating the Bear Creek area an FCC. *See* Admin. R., Index 33, Exs. 93, 94. An FCC provides counties with an alternative means of

designating an area urban and is an exception to the general locational constraints placed on UGAs in the GMA.

> An urban growth area may include territory that is located outside of a city *only* if such territory already is characterized by urban growth whether or not the urban growth area includes a city, or is adjacent to territory already characterized by urban growth, or is a *designated new fully contained community* as defined by RCW 36.70A.350.

RCW 36.70A.110(1) (emphasis added). RCW 36.70A.350 sets forth nine specific criteria counties must meet in permitting FCCs.[10] A divided Board upheld King County's designation of the Bear Creek area as an FCC. CP at 62. The Board determined that the development regulations adopted by King County "mirror[ed] and amplif[ied]" the requirements contained in RCW 36.70A.350 and that the "GMA does not contain any explicit locational requirements for FCCs other than those factors enumerated in .350(1)." *Id.* After reversal by the superior court, the Court of

---

[10] RCW 36.70A.350 provides in part:

(1) A new fully contained community may be approved in a county planning under this chapter if criteria including but not limited to the following are met:

(a) New infrastructure is provided for and impact fees are established consistent with the requirements of RCW 82.02.050;

(b) Transit-oriented site planning and traffic demand management programs are implemented;

(c) Buffers are provided between the new fully contained communities and adjacent urban development;

(d) A mix of uses is provided to offer jobs, housing, and services to the residents of the new community;

(e) Affordable housing is provided within the new community for a broad range of income levels;

(f) Environmental protection has been addressed and provided for;

(g) Development regulations are established to ensure urban growth will not occur in adjacent nonurban areas;

(h) Provision is made to mitigate impacts on designated agricultural lands, forest lands, and mineral resource lands;

(i) The plan for the new fully contained community is consistent with the development regulations established for the protection of critical areas by the county pursuant to RCW 36.70A.170.

In addition, in establishing FCCs, counties must reserve a portion of the 20 year office of financial management population projection for the FCC and offset the UGA area accordingly. RCW 36.70A.350(2).

Appeals agreed with the Board's conclusion and reinstated its order. *Quadrant Corp.*, 119 Wn. App. at 572.

¶31 FOTL raises two challenges to the Board's determination that King County complied with the GMA in permitting an FCC at the Bear Creek area. Both arguments essentially assert that the GMA contains specific locational requirements in addition to the nine criteria listed in RCW 36.70A.350 that require FCCs be contained in fact.

¶32 First, FOTL argues that RCW 36.70A.350(1)(g) and the term "fully contained" create an explicit "containment requirement" mandating that FCCs be contained in fact and that the makeup and placement of the Bear Creek area "makes containment particularly unachievable" at that location. FOTL Pet. for Review at 16-18; *see* CP at 51-58. King County counters that it met all the detailed requirements of RCW 36.70A.350 and specifically complied with subsection .350(1)(g) by enacting development regulations such as rural and resource zoning for adjacent lands and establishing utility restrictions requiring water and sewer systems be sized " 'so as to ensure that urban growth will not occur in adjacent nonurban areas.' " Suppl. Br. of King County at 8-13 (quoting King County Code (KCC) 21A.39.200(B)(7)). FOTL responds that King County's development regulations fail "to ensure urban growth will not occur in adjacent nonurban areas." RCW 36.70A.350(1)(g); *see* CP at 51.[11]

¶33 With regard to RCW 36.70A.350(1)(g), the Board concluded that King County in fact adopted development regulations to " 'ensur[e] urban growth will not occur in

---

[11] FOTL relies heavily on its allegation that King County "admitted" in its comprehensive plan and amendments thereto that containment is not possible within King County. *See* FOTL Pet. for Review at 5; FOTL Suppl. Br. at 2. While it is true that King County's comprehensive plan, in Policy R-104, stated that because of the makeup of King County, " 'containment' would not be possible," *see* Admin. R., Index 33, Ex. 16, at 61, this "admission" is not relevant for two reasons. First, the 1994 comprehensive plan designated the Bear Creek area as a UGA, so it is evident King County was not referring to Bear Creek when establishing this policy. Second, based on the conclusion of the Board, the Court of Appeals, and this court, whether the Bear Creek area could be "contained in fact" is not the proper standard for compliance.

adjacent nonurban areas' " by adopting the regulations above. *See* CP at 54 (citing KCC 21A.39.200). FOTL then secondarily asserts here that the term "fully contained" itself establishes a general requirement that such communities be contained in fact. But while the GMA does not specifically define the term "fully contained," there is no indication that that term, standing alone, has any independent relevance. The primary goal of statutory construction is to discern the legislature's intent, and "the court begins with the statute's plain language and ordinary meaning." *King County*, 142 Wn.2d at 555. We additionally look to the applicable legislative enactment as a whole, harmonizing its provisions by reading them in context with related provisions and the statute as a whole. *Id.* at 560; *see also Taxpayers of Tacoma*, 108 Wn.2d at 693.

¶34 The statutory provisions regarding "fully contained communities" do not independently discuss any "full containment" requirement, *see generally* RCW 36.70A.110, .350, but, relevant here, the GMA read as a whole provides sufficient insight into the intended definition of the term "fully contained community." In RCW 36.70A.110(1), the GMA establishes that a UGA may include territory outside of a city if it is a "designated new fully contained community as defined by RCW 36.70A.350." (Emphasis added.) Thus the legislature explicitly directs us to RCW 36.70A.350 for its definition of an FCC. RCW 36.70A.350(1) states that a new FCC "may be approved in a county planning under this chapter if criteria including but not limited to the following are met" and then sets forth nine detailed criteria. Thus, looking to the GMA as a whole, and harmonizing its provisions, reveals that the legislature did adequately define "fully contained communities" as planning designations which meet all the criteria of RCW 36.70A.350. FOTL's attempt to create additional requirements by parsing out the terms "fully contained" is not consistent with legislative intent nor our principles of statutory construc-

tion.[12] As such, the legislature established all the require-
ments necessary to designate an area an FCC, and those
requirements are contained within RCW 36.70A.350.

¶35 Next, FOTL asserts that the enumerated GMA goals
provide substantive locational containment requirements
for FCCs. It is on this ground that the superior court
reversed the Board and ruled King County's FCC designa-
tion violated the GMA goals because it found that the FCC
could not be "fully-contained *in fact.*"[13] CP at 22 (emphasis
added). FOTL argues that the language that FCCs must
meet the enumerated "criteria including but not limited to"
those listed in RCW 36.70A.350, implies that the GMA
imposes additional requirements above and beyond those
listed.[14] Thus it contends that the GMA goal of reducing
sprawl, RCW 36.70A.020(2), precludes King County from
designating the Bear Creek area an FCC. In support of

---

[12] Unlike remedial legislation or regulatory legislation such as the Shoreline
Management Act of 1971, chapter 90.58 RCW, (SMA), the GMA does not contain
a requirement that it be liberally construed, nor have courts found one to exist.
*See Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County,* 135 Wn.2d 542,
565, 958 P.2d 962 (1998) (noting the GMA carefully limits the boards' authority
and contains no principle of liberal construction); *compare* RCW 90.56.900
(establishing that the SMA "shall be liberally construed to effect [its] purposes");
*see also* Settle, *supra,* at 34 ("[U]nlike [the State Environmental Policy Act,
chapter 43.21C RCW] and SMA, GMA was spawned by controversy, not consen-
sus. The relative spheres of state mandate and local autonomy were the product
of extremely difficult legislative compromise. It is no accident that the GMA
contains no provision for liberal construction.").

[13] King County asserts this issue is precluded by the APA, RCW 34.05.554,
because it asserts FOTL failed to raise the issue in front of the Board. King
County's Answer to FOTL Pet. for Review at 2. While the Board itself determined
that FOTL "abandoned" all challenges to King County's compliance with RCW
36.70A.350(1) "[b]ut for [its] challenge to the County's compliance with RCW
36.70A.350(1)(g) " which it labeled its " 'containment' argument," *see* CP at 52, this
statement does not indicate that consideration of the GMA goals was foreclosed in
this context. In fact, while the Board majority did not directly address this issue
in its order, FOTL did question in front of the Board, whether "continued validity
of [the FCC amendments] substantially interfere[s] with the fulfillment of the
goals expressed in RCW 36.70A.020?" Admin. R., Index 10 at 2.

[14] FOTL misinterprets this provision. A more persuasive reading suggests that
counties must comply with the enumerated state mandated requirements and
that *counties* may establish additional requirements in permitting the creation of
FCCs. King County did just that. The Board found that King County's develop-
ment regulations for the Bear Creek FCC "mirror[ed] and *amplif[ied]* the nine
detailed requirements . . . contained in RCW 36.70A.350(1)(a)-(i)." CP at 55 (em-
phasis added).

its proposition, FOTL cites one of this court's prior rulings instructing that local planning discretion " 'is bounded ... by *the goals* and requirements of the GMA' " and thus asserts all planning actions are challengeable on the basis that they violate one of the goals of the GMA. FOTL Pet. for Review at 8 (quoting *King County*, 142 Wn.2d at 561). King County's response is twofold; one, it asserts that the enumerated FCC criteria themselves act to fulfill and further the general GMA antisprawl goal, and two, that the GMA goals do not create additional substantive criteria for the location of FCCs.

¶36 In *King County*, this court considered both the goals and the requirements of the GMA in determining whether allowing active recreation on designated agricultural lands violated the GMA. 142 Wn.2d at 555-58. However, *King County* did not rely on the applicable goal in isolation nor did it hold the goals to independently create substantive requirements. *Id.* Rather this court construed the GMA's relevant agricultural provisions there as a whole as a means of discerning legislative intent. *Id.* at 556-61.

¶37 The legislature established that the GMA goals "shall be used *exclusively for the purpose of guiding* the development of comprehensive plans and development regulations." RCW 36.70A.020 (emphasis added). Additionally, while the GMA goals "collectively convey some conceptual guidance for growth management," the GMA "explicitly denies any order of priority among the thirteen goals" and it is evident that "some of them are mutually competitive." Settle, *supra*, at 11. We have previously stated that the primary method required for meeting the goals of subsections .020(1) (urban growth) and .020(2) (reduce sprawl) is set forth in RCW 36.70A.110. *Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County,* 135 Wn.2d 542, 548, 958 P.2d 962 (1998). King County complied with the process allowed by section .110, elected to designate the Bear Creek area as an FCC, and then subsequently followed, and in fact "amplified," all the criteria set forth in section .350. FOTL has not shown that King County failed

to be "guided" by the urban growth and antisprawl goals in exercising their discretion.

¶38 In actuality, while FOTL labels the Bear Creek FCC as impermissible sprawl, King County asserts that *failure* to designate the area as urban,[15] because the site was already subject to one-acre subdivision development applications, would result in the very "sprawling, low-density development" the GMA was designed to prevent. RCW 36.70A.020(2); King County Pet. for Review at 3. We agree. Thus, even if this court were to hold that the goals place substantive limits on the location of FCCs, which we decline to do, FOTL has not proved that King County's designation would in fact run counter to the GMA's goals nor that it was "clearly erroneous." RCW 36.70A.320(3). While we have stated that "deference is given only to policy choices that are consistent with the goals and requirements of the GMA," *Cooper Point Ass'n*, 148 Wn.2d at 14, the Board here reasonably concluded that King County's actions were consistent with the GMA. If FCCs are "legislatively created loophole[s]," CP at 65 (board member North, concurring), it is the job of the legislature and not the board's nor the court's to determine whether such a result is good public policy. FOTL's fundamental argument is not a legal one but a disagreement with legislative policy.

¶39 In accord with the above reasoning, we affirm the Court of Appeals and Board's holding that King County met all the applicable requirements for designating the Bear Creek area an FCC.

### Further Board Action Unnecessary

¶40 The Bear Creek area has been the subject of litigation for over a decade. Our holding today fully resolves the parties' dispute and makes remanding to the Board unnecessary. In affirming the Board's conclusion regarding the

---

[15] "Final approval of an application for a new fully contained community shall be considered an adopted amendment to the comprehensive plan prepared pursuant to RCW 36.70A.070 designating the new fully contained community as an urban growth area." RCW 36.70A.350(2).

FCC designation, the subject property is allowed to develop at urban densities. While, in the context of the UGA designation, the parties continue to dispute the vested nature of the original development applications, based on our resolution of this case, remand is unnecessary for two reasons. First, the UGA dispute has no bearing on the area's FCC designation which independently permits urban growth and development. Second, the Board previously concluded in the context of this dispute that it lacks jurisdiction to determine whether a specific development application has in fact vested.[16] Thus, remand of this case is both unnecessary and, in the interest of finality, unwarranted.

## III

## Conclusion

¶41 In conclusion, we affirm in part and reverse in part the Court of Appeals decision. We hold that deference to county planning actions that are consistent with the goals and requirements of the GMA supersedes the deference granted by the APA and courts to administrative bodies in general, *see* RCW 36.70A.320, .3201, and cedes only when it is shown that a county's planning action is in fact a "clearly erroneous" application of the GMA. Based on this standard of review, we hold that here the Board correctly concluded that King County met all requirements under the GMA to designate the Bear Creek area an FCC, and further that counties planning under the GMA may consider vested

---

[16] *See King County*, 91 Wn. App. at 29 n.66 (noting that "[t]he Board declined to take a position on the issue, concluding that because the vested rights doctrine is a common-law doctrine, it did not have jurisdiction to determine whether a specific development application has vested"); *see also id.* at 29-30. *Cf. Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 867-68, 947 P.2d 1208 (1997) (noting growth management hearings boards have narrowly defined power of review limited to whether planning jurisdictions have complied with the GMA).

development rights when determining whether an area "already is characterized by urban growth" under the GMA.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.