158 P.3d 638 (2007)
KITSAP COUNTY, Appellant,
v.
CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, an agency of the State of Washington; Futurewise formerly known as 1000 Friends of Washington, Kitsap Citizens for Responsible Planning; Rick Bjarnson; and Jerry Harless, Respondents.
No. 35267-2.
Court of Appeals of Washington, Division 2.
May 30, 2007.
*640 Shelley E. Kneip, Lisa J. Nickel, Kitsap County Prosecuting Attys. Office, Port Orchard, WA, for Appellant.
Jerry Harless (Appearing Pro Se).
Melody L. Allen, Suquamish Tribe, Office of Tribal Attorn, Suquamish, WA, Martha Patricia Lantz, Office of Atty. Gen., Lic. & Admin. Law Div., Olympia, WA, David Alan Bricklin, Bricklin Newman Dold LLP, Elaine Louise Spencer, Graham & Dunn PC, Tim Trohimovich, Keith Patrick Scully, Futurewise, Seattle, WA, John T. Zilavy, Unterschleissheim, ZZ, for Respondents.
PENOYAR, J.
¶ 1 Kitsap County appeals from the Growth Management Hearings Board's (the Board) decision regarding the County's attempts to comply with the Growth Management Act's (GMA), chapter 36.70A RCW, reporting procedures. The Board found that the County's actual growth was inconsistent with its comprehensive plan and that, under RCW 36.70A.215(4), the County was required to adopt "reasonable measures" to increase consistency. In a second appeal, the Board found that the County's "reasonable measures" were adequate. In this consolidated appeal, we affirm the Board's decision that there were inconsistencies in the County's actual growth and their planning policies and comprehensive plan; but we reverse the Board's decision that the "reasonable measures" were adequate. The County must take further steps to make growth consistent with its comprehensive plan.

FACTS
¶ 2 Washington State adopted the GMA to address growth in our state and to minimize the threats of unplanned growth to the environment, economic development, and public welfare. RCW 36.70A.010; Diehl v. Mason County, 94 Wash.App. 645, 650, 972 P.2d 543 (1999). The GMA required the central Puget Sound area counties to adopt a comprehensive land use plan[1] and to designate urban growth areas (UGAs)[2] by July 1994. RCW 36.70A.040(3). Between 1994 and 1998, Kitsap County attempted to adopt a compliant comprehensive plan. After other failed attempts, in 1998, it finally adopted a GMA compliant comprehensive plan and designated UGAs consistent with the GMA.
¶ 3 As the statute required, the County issued a development report in 2002 in which it analyzed the county's development trends from 1995 to 1999. Since the County did not adopt a compliant comprehensive plan until 1998, this "buildable lands report" (BLR) contained just one year of data about the County's development trends under the GMA compliant comprehensive plan. 8 Administrative Record (AR) at 4407. The BLR reported that during 1995 to 1999, 18 percent of residential units occurred in UGAs and 25 percent in cities. The County's growth policy promoted urban area development and stated that 83 percent of new population growth should be directed to UGAs.
*641 The Board's First Decision
¶ 4 After the County issued the BLR, the Suquamish Tribe, Futurewise,[3] and Jerry Harless appealed to the Board, arguing that the County violated the GMA because its growth policies were inconsistent with actual growth.
¶ 5 The Board agreed. It found that the BLR revealed "inconsistencies between what is occurring and what the County's Plan is designated to achieve." 8 AR at 4410. It cited to two sections in support of its conclusion. First, it cited to a BLR section explaining that:
Residential development has been active in Kitsap County between 1995 and 1999, with a slight majority of all new residential permits issued in the rural unincorporated area. [A chart indicates 55% of the residential units permitted are outside UGAs and cities.] . . . In terms of land area, the vast majority of new residential land consumed is in the jurisdiction of rural unincorporated Kitsap County. [A chart indicates 81.9% of the residential acres permitted are outside UGAs or cities.] . . . In rural unincorporated Kitsap County, development densities average approximately 1 unit per acre, which represents a midpoint between extremely rural and urban style densities. One development constraint is the large number of smaller, non conforming lots of record. Until these parcels are fully absorbed, the County may face obstacles in directing new growth toward urban areas.
8 AR at 4410. Second, it cited to Kitsap County Policy A.3 that ordered:
The Kitsap Regional Coordinating Council shall adopt a new process for allocating the forecasted population for the period 2002-2022 and forward by September 30, 2001, consistent with the requirements of the Growth Management Act. The allocation shall be based on the Buildable Lands Analysis and it shall promote a countrywide development pattern directing over five sixths [83%] of new population growth to the designated Urban Growth Areas. The County and the Cities recognize that the success of this development pattern requires not only the rigorous support of Kitsap County in the rural areas, but also Cities' comprehensive plans being designed to attract substantial new population growth.
8 AR at 4410.
¶ 6 The Board found that the BLR identified development patterns that were inconsistent with the GMA, the County's planning policies, and its comprehensive plan. Under RCW 36.70A.215(4), the Board therefore directed the County to identify "reasonable measures" to remedy the inconsistencies and to implement the measures by December 1, 2004. 8 AR at 4410-11 (citing RCW 36.70A.215(4); .215(1)(b); .130(4)(a)). The Board required the County to adopt and implement measures that were reasonably likely to increase consistency during the subsequent five-year period. RCW 36.70A.215(4). In its decision on reconsideration, the Board also indicated that the County's ten-year UGA review was due on December 1, 2004.
The Board's Second Decision
¶ 7 In response to the Board's decision and to comply with RCW 36.70A.215(4), the County passed a resolution listing various "reasonable measures" taken to comply with the GMA. 3 Clerk's Papers (CP) at 502. Futurewise and Harless again appealed, arguing that the resolution did not contain any new actions, was merely a summary of actions the County previously had taken, and that the actions did not meet the GMA's definition of "reasonable measures." RCW 36.70A.215. Harless also appealed, arguing that the County did not complete its ten-year UGA review by December 1, 2004.
¶ 8 In June 2005, the Board concluded that the measures did meet the GMA's definition of "reasonable measures," under RCW 36.70A.215, and upheld its previous decision that the County was required to complete its ten-year UGA review by December 1, 2004. During this proceeding, the County acknowledged that it had not yet conducted its ten-year *642 UGA review and, due to the complexity of the County's review, the Board therefore extended the UGA review deadline from December 1, 2004 to June 20, 2006. AR 1241.
Both Parties Appeal to Trial Court
¶ 9 The parties appealed the Board's two decisions to superior court. The court (1) affirmed the Board's decision that the County's comprehensive plan and planning policies were inconsistent; (2) reversed the Board's decision that the "reasonable measures" the County adopted met the GMA's definition of "reasonable measures" and remanded to the Board to allow the County to propose additional measures to satisfy the GMA; and (3) affirmed the Board's decision that the County was required to conduct the ten-year UGA review by December 1, 2004. The parties now appeal.

ANALYSIS
I. DEFERENCE, BURDEN OF PROOF, AND STANDARD OF REVIEW UNDER THE GMA
¶ 10 This is an appeal from a decision of the administrative board charged with adjudicating GMA compliance. RCW 36.70A.280; .302.
¶ 11 The GMA states that the Board must presume that a county's comprehensive plans and development regulations are valid upon adoption. RCW 36.70A.320(1). It requires that the Board defer to county decisions and actions. Pres. Our Islands v. Shorelines Hearings Bd., 133 Wash.App. 503, 516, 137 P.3d 31 (2006).
¶ 12 We apply the Administrative Procedure Act (APA) standards in reviewing an administrative board decision. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000). Under the APA, we review the record before the Board, sitting in the same position as the trial court, and give substantial weight to the agency's interpretation of the statute it administers. King County, 142 Wash.2d at 553, 14 P.3d 133.
¶ 13 Although the APA requires us to give substantial weight to an agency's interpretation, the GMA requires that we give even greater deference to county planning actions that are consistent with the GMA's goals and requirements. Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005). Thus, under the APA we need not give deference to a board's ruling that fails to apply the more deferential standard of review to county actions. Quadrant Corp., 154 Wash.2d at 238, 110 P.3d 1132. Deference to county action under the GMA only ends if its actions are "clearly erroneous" applications of the GMA. Quadrant Corp., 154 Wash.2d at 238, 110 P.3d 1132.
¶ 14 The Board must find that a county's actions comply with the GMA unless it determines that the actions are clearly erroneous in view of the entire record before the Board and in light of the GMA's goals and requirements. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must be "left with the firm and definite conviction that a mistake has been committed." Dep't of Ecology v. Pub. Util. Dist. 1, 121 Wash.2d 179, 201, 849 P.2d 646 (1993).
¶ 15 A party challenging a county's actions bears the burden of demonstrating that a county's actions do not comply with the GMA. RCW 36.70A.320(2). We review the Board's legal conclusions de novo. City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998). Where an agency's findings of fact are unchallenged, we treat the findings as verities on appeal. Manke Lumber Co. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 113 Wash.App. 615, 628, 53 P.3d 1011 (2002).
II. INCONSISTENCIES
¶ 16 The County first asserts that the BLR did not demonstrate any "inconsistencies" between actual growth and the County's policies and plan under the GMA. It asserts that the GMA only requires development analysis of urban areas, not rural areas, and that the BLR sections the Board cited in support of its conclusion deal with development in rural areas that are not subject to the GMA.
¶ 17 The County also asserts that the data contained in the BLR is irrelevant to the *643 County's attempts to comply with the GMA because the County's comprehensive plan was effective in 1998 and the BLR covers the County's development from 1995 to 1999, and the Board's decision penalizes the County for past decisions and past noncompliance with the GMA. The County argues that when the GMA was passed, many County residents owned land that did not comply with the GMA and the property owners of these nonconforming lots had vested, pre-GMA rights. The County argues that vested, nonconforming lots must be considered in analyzing the high number of residential building permits reported in the BLR.
¶ 18 The GMA's goal is to encourage development in areas already characterized by urban development, to encourage conservation of productive agricultural lands, and to reduce urban sprawl. RCW 36.70A.020.
¶ 19 The GMA requires counties to adopt a comprehensive plan and to designate UGAs. RCW 36.70A.040. It orders counties with large populations or rapid growth to plan for future growth and to issue reports on whether it is achieving urban densities that are consistent with the county's planning policies and comprehensive plan. RCW 36.70A.040; .215.
¶ 20 In 1997, the legislature amended the GMA to require counties to implement a specific review and evaluation program for growth and ensure urban density consistent with the GMA's goals. RCW 36.70A.215. The program's purpose is to evaluate progress by comparing growth projections in planning policies and comprehensive plans with actual growth and development. RCW 36.70A.215(1)(a)-(b). The review and evaluation program must include data from land use and activities both inside and outside UGAs and must provide for annual collection of data on urban and rural land uses. RCW 36.70A.215(2)(a). The purpose of the evaluation is to allow counties to determine whether they are achieving urban densities in line with their policies and plan under the GMA. RCW 36.70A.215(1)(a).
¶ 21 In 2002, the County submitted the BLR covering 1995 to 1999 to comply with RCW 36.70A.215. The Board found that the BLR demonstrated inconsistencies between actual growth in the County and growth under the County's development plan. The Board correctly placed the burden on the Suquamish Tribe, Futurewise, and Harless and found that the BLR revealed inconsistencies because the County (1) failed to accommodate 83 percent of new growth within the UGAs; (2) failed to achieve appropriate urban densities within the UGAs; and (3) allowed inappropriate development in rural areas. We agree with the Board.
¶ 22 As outlined above, the GMA requires counties and cities to balance and govern growth in urban and rural areas. See RCW 36.70A.020. The statute also requires counties to conduct periodic reviews of their own performance on development and the legislature provided that these reports must include data from development both inside and outside the UGAs. RCW 36.70A.215(2)(a), (b). These are the GMA's core goals. The County argues at length that the GMA does not apply to rural areas and that the Board erred in focusing on rural development. The County's argument is not compelling. RCW 36.70A.215(2)(a) specifically states that a county's review and evaluation program must include data from land use and activities both inside and outside UGAs and must provide for annual collection of data on both urban and rural land uses. Therefore, in determining whether inconsistencies exist, it is incumbent on the Board to consider data on development in both rural and urban areas.
¶ 23 The goal of the GMA's periodic reviews is to bring growth into compliance with the comprehensive plan, and it is incumbent on the County to use the best available information to conduct these reviews. The BLR may have been outdated and it may only contain data from one year of relevant analysis, but use of imprecise data does not excuse the County from complying with the GMA's requirements. The BLR revealed that a majority of new residential permits were issued in rural areas. The County's policy indicated that it would promote a development pattern directing 83 percent of new population growth to urban areas. These two calculations are inconsistent and we affirm the Board's conclusion.
*644 ¶ 24 The County's argument regarding vested, nonconforming lots is not compelling. The nonconforming lots were something the County was aware of when it adopted the comprehensive plan and should have been factored into the County's development projections. We agree with the Board that inconsistencies existed between actual growth and the County's planning policies under the GMA and affirm.
III. REASONABLE MEASURES
¶ 25 The County next argues that the Board was correct in finding that the "reasonable measures" identified in its resolution were adequate to ensure compliance with urban density requirements. The trial court reversed the Board's finding, and the County argues that the court erred. The County asserts that the Board, not the trial court, gave the proper deference to the County and that we should therefore uphold the Board's decision that the "reasonable measures" were adequate.
¶ 26 Futurewise argues that the "reasonable measures" that the County identified were in place and operative while the inconsistencies developed and that the resolution was merely a summary of actions the County had previously taken and did not contain any new actions. The trial court agreed with Futurewise and reversed the Board stating:
Presenting a litany of prior measures taken when those measures have obviously not achieved the desired result is contrary to the intent of the statute, which is to adopt measures over time which will achieve certain goals.
3 CP at 503.
¶ 27 If there are "inconsistencies" between actual growth and their GMA planning, then the county must adopt "reasonable measures" to remedy the inconsistency:
If the evaluation required by subsection (3) of this section demonstrates an inconsistency between what has occurred since the adoption of the county-wide planning policies and the county and city comprehensive plans and development regulations and what was envisioned in those policies and plans and the planning goals and the requirements of this chapter . . . the county and its cities shall adopt and implement measures that are reasonably likely to increase consistency during the subsequent five-year period.
RCW 36.70A.215(4).
¶ 28 After the Board concluded that there were inconsistencies, the County listed 18 "reasonable measures" adopted under RCW 36.70A.215 to promote urban growth. The County stated that it would encourage accessory dwelling units in single-family zones, allow clustered residential development, duplexes, town houses and condominiums, encourage development or urban centers and villages, encourage mixed-use development, create annexation plans and affordable and manufactured housing, increase urban amenities, allow master planning for large parcel development, encourage transportation-efficient land use, and increase access to critical services near homes, jobs, and transit.
¶ 29 Futurewise is correct that listing regulations in existence during the time of an "inconsistency" is not likely to cause any different result and are not "reasonable measures" that are likely to increase consistency during the subsequent five-year period. RCW 36.70A.215(4). Because the measures the County identified all existed during the time of the inconsistency, we reverse the Board's conclusion that they were "reasonable measures" and hold that the County therefore violated RCW 36.70A.215 by not adopting and implementing measures that were reasonably likely to increase consistency.
IV. THE TEN-YEAR UGA REVIEW
¶ 30 The County also argues that the Board erred in requiring the County's ten-year UGA review by December 1, 2004. The County asserts that, because it did not adopt its comprehensive plan and did not designate its UGAs until 1998, the first ten-year review is not due until ten years after 1998, in 2008.
¶ 31 Futurewise disagrees. It argues under RCW 36.70A.130(3) that the deadline for the County's ten-year UGA review is December 1, 2004. Futurewise explains that all other GMA deadlines were triggered by the July 1, 1994 deadline and that there are *645 important policy reasons for requiring a consistent timeline for GMA review.
¶ 32 Under RCW 36.70A.130(3):
Each county that designates urban growth areas under RCW 36.70A.110 shall review, at least every ten years, its designated urban growth area or areas, and the densities permitted within both the incorporated and unincorporated portions of each urban growth area. In conjunction with this review by the county, each city located within an urban growth area shall review the densities permitted within its boundaries, and the extent to which the urban growth occurring within the county has located within each city and the unincorporated portions of the urban growth areas . . . The review required by this subsection may be combined with the review and evaluation required by RCW 36.70A.215.
(emphasis added).
¶ 33 The issue here is from what date the ten-year UGA review begins. RCW 36.70A.130(3) does not specify the date. The Board determined, and the trial court agreed, that December 1, 2004 marked the deadline for the first ten-year UGA review. We disagree.
¶ 34 Interpreting a statute is a question of law that we review de novo. Morales v. Westinghouse Hanford Co., 73 Wash.App. 367, 370, 869 P.2d 120 (1994); Dep't of Labor & Indus. v. Fankhauser, 121 Wash.2d 304, 308, 849 P.2d 1209 (1993). When called on to interpret a statute, our primary obligation is to give effect to the legislature's intent. Lacey Nursing Ctr. v. Dep't of Revenue, 128 Wash.2d 40, 53, 905 P.2d 338 (1995). We first look to the statute's plain language in order to fulfill its obligation and give effect to legislative intent. Lacey, 128 Wash.2d at 53, 905 P.2d 338. When a statute is unambiguous, we derive the legislature's intent from the plain language alone. Waste Mgmt. of Seattle, Inc., v. Util. Transp. Comm'n, 123 Wash.2d 621, 629, 869 P.2d 1034 (1994). In determining the statute's plain meaning, we may look to "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003) (quoting Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002)).
¶ 35 A reviewing body may not add words where the legislature has chosen to exclude them. Rest. Dev., Inc. v. Cananwill, Inc., 150 Wash.2d 674, 682, 80 P.3d 598 (2003). We adhere to the rule of expressio unius est exclusio alterius, or specific inclusions exclude implication. BLACK'S LAW DICTIONARY 581 (6th ed.1990). In other words, if a statute specifically designates the things on which it operates, we infer that the Legislature intended all omissions. In re Pers. Restraint of Bowman, 109 Wash.App. 869, 875, 38 P.3d 1017 (2001).
¶ 36 From the statute's plain language, the legislature specifically included a reference to the December 1, 2004 deadline in RCW 36.70A.130(1). But it did not include a reference to the December 1, 2004 deadline in subsection (3). Therefore, we hold that the legislature intended to omit the reference to the December 1, 2004 from subsection (3) and decline to add words to the statute where the legislature has chosen to exclude them.
¶ 37 The GMA originally contained the provision for the ten-year review of UGAs. Laws of 1990, 1st Ex.Sess., ch. 17, § 13. Only in 1997 did it establish specific deadlines for the first broader review and update of complete comprehensive plans, and then that deadline was September 1, 2002. Laws of 1997, ch. 429, § 10. In 2002, the legislature set the current comprehensive plan review deadline of December 1, 2004. Laws of 2002, ch. 320, § 1. Even after these two updates to the GMA deadline for comprehensive plan review contained in RCW 36.70A.130(4), the legislature did not alter subsection (3) to include a reference to the December 1, 2004 deadline. The legislature clearly considered the GMA deadlines and could have easily included a reference to subsection (4) in subsection (3). It did not. The statute plainly states that "[e]ach county that designates urban growth areas . . . shall review, at least every ten years, its designated urban growth areas . . ." RCW 36.70A.130(3). Thus, the review would begin *646 ten years after the designation, which for Kitsap County would be in 2008, not 2004.
¶ 38 The trial court and the Board reasoned that the County's deadlines for the initial review of the comprehensive plan and the UGAs should be the same. The GMA requires review of UGA's "at least" every ten years, but it requires subsequent reviews of the comprehensive plan to take place every seven years. RCW 36.70A.130(1) and (4)(a). Therefore, even if the initial review of the comprehensive plan and UGAs is due on the same day, the deadline for the two reviews will not be the same again for 70 years.
¶ 39 Although it may be reasonable for GMA review deadlines to be consistent with each other, under the plain language of RCW 36.70A.130, the legislature did not seem concerned with coordinating these reviews. It did, however, specifically allow counties to conduct the required reviews more frequently than specified and provided counties the flexibility to coordinate the timing of the various reviews. RCW 36.70A.130(5)(a). Although it allowed for flexibility, the legislature did not require they be due at the same time. We reverse the Board's conclusion and allow the county until December 1, 2008 to submit the UGA review.[4]
V. ADVISORY OPINIONS
¶ 40 Finally, the County argues that the Board acted beyond jurisdiction by issuing an advisory opinion when it concluded that the County's ten-year UGA review was due on December 1, 2004 and when it suggested measures that would qualify as "reasonable measures." Futurewise does not address this argument.
¶ 41 The GMA, RCW 36.70A.290(1) provides that:
All requests for review to a growth management hearings board shall be initiated by filing a petition that includes a detailed statement of issues presented for resolution by the board. The board shall render written decisions articulating the basis for its holdings. The board shall not issue advisory opinions on issues not presented to the board in the statement of issues, as modified by any prehearing order.
(emphasis added).
¶ 42 The County argues that the parties did not raise or brief the UGA review deadline issue and that the Board's decision that the ten-year UGA review due on December 1, 2004 was advisory and outside the Board's jurisdiction.
¶ 43 We hold that the Board did not issue an advisory opinion. It is true that the Board's conclusion regarding the ten-year review came after the motion for reconsideration, but in its first decision, the Board considered issues relating to the County's UGAs. The Board considered the County's amendments to its comprehensive plan and its UGA expansions, which posed questions about population projections and allocations. In its order on reconsideration, the Board analyzed whether it misinterpreted a key fact concerning the size of a UGA. The Board conceded that it did make a factual error regarding the UGA and then analyzed whether the UGA complied with the GMA. It decided that the County's UGA did comply with the GMA and stated that the County's next periodic review is due December 1, 2004. It stated that:
The Board reads RCW 36.70A.130 to require that on or before December 1, 2004 (.130(4)(a)), Kitsap County's planning cycle must be brought into the GMA sequence, using OFM's most recent ten-year population forecast, (.130(1)(a)), evaluating its UGA boundaries and densities (.130(3)), and applying BLR findings to its UGA decisions (.130(3) and .215).
1 CP at 91. At issue was whether the County's UGAs complied with the GMA including the required periodic review. Therefore, it was not merely advisory for the Board to determine the deadline for UGA review.
¶ 44 The County also argues that the Board's discussion of "reasonable measures" in its second opinion was advisory and beyond the Board's jurisdiction. In a footnote to its decision, the Board listed measures that would bring the county in compliance with the GMA. We also hold that the Board's *647 discussion of "reasonable measures" was not advisory. The Board's discussion in its second decision clearly concerned whether the measures the County adopted complied with the GMA. Giving examples of measures that might comply with the GMA is not advisory.
¶ 45 We affirm the Board's conclusion that the BLR was inconsistent with the County's planning policies and its comprehensive plan and affirm that the County's measures were not reasonably likely to remedy the inconsistencies. We reverse, however, the Board's conclusion that the County's ten-year review was due in 2004, and find that it is due on December 1, 2008.
We concur: BRIDGEWATER, P.J., and QUINN-BRINTNALL, J.
NOTES
[1] "Comprehensive land use plan," "comprehensive plan," or "plan" means a generalized coordinated land use policy statement of the governing body of a county or city that is adopted pursuant to the growth management act. RCW 36.70A.030(4).
[2] "Urban growth areas" means areas designated pursuant to RCW 36.70A.110 to accommodate projected population growth. RCW 36.70A.030(18).
[3] Futurewise was formerly named "1000 Friends of Washington." Consistent with the parties' briefs, we will continue to refer to the organization as "Futurewise."
[4] This does not affect the county's obligation under RCW 36.70A.215.